**In re "AGENT ORANGE" PRODUCT LIABILITY LITIGATION.**

**No. MDL 381 (JBW).**

United States District Court, E.D. New York.

July 5, 1988.

MEMORANDUM AND ORDER ON
DISTRIBUTION ON REMAND

WEINSTEIN, District Judge:

### TABLE OF CONTENTS

I.   PROCEDURAL HISTORY
   A.  Post–Settlement
   B.  Appeals
   C.  Post–Appeal Hearings and Advisory Boards
II.  SUMMARY OF ALLOCATION OF FUNDS
   A.  Original and Revised Payment Program
   B.  Australian & New Zealand Class Members
   C.  Class Assistance Program
   D.  Attorneys' Fees and Expenses
   E.  Division of Funds
III. PAYMENT PROGRAM
   A.  Inclusion of Opt–Out Claimants and Late Claimants
   B.  Additions and Modifications
      1.  Exposure Criteria
      2.  Length
      3.  Claims Administrator
      4.  Special Master for Appeals
      5.  Other Implementation Actions
IV.  CLASS ASSISTANCE PROGRAM
   A.  Original Foundation Concept
   B.  Post–Appeal Modifications
      1.  Veterans Advisory Board, Advisor, Executive Director and Staff
      2.  Alternatives Under Consideration
         a.  Information and Referral Network
         b.  Family– and Child–Related Needs
         c.  Homeless and Disadvantaged Veterans
         d.  Genetic Counseling
         e.  Assistance with Rights and Benefits
         f.  Reserve
         g.  Tentative Conclusions
      3.  Data Required
      4.  Avoiding Duplicative Programs
V.   MONEY MANAGEMENT AND ACCOUNTING
   A.  Present Method

B. Challenges Confronting Financial Management During Distribution

C. Selection of Contractors to Provide Financial Services

D. Investment and Depositary Arrangements

E. Accounting Services

F. Further Details of Distribution Planning

VI. APPENDICES

A. Sample Letter to Claimants

B. Sample "Application for Payments" Kit

On June 30, 1988, the Supreme Court denied the last two of the seven petitions for certiorari filed in the multidistrict litigation "Agent Orange" case. The only phase of the case now unresolved, and the subject of this memorandum, is the final distribution of the settlement fund.

After three and a half years of appeals, the distribution of the settlement fund is at hand. The court regrets any inconvenience or harm suffered by members of the class as a result of the delays caused by the legal process. Detailed consideration of the issues raised by the lawyers for plaintiffs on appeal was necessary to ensure fairness to members of the class and to their attorneys, and to guarantee compliance with the law in unique and highly complex circumstances.

Issuance of mandates to this court addressing all appeals made in the "Agent Orange" case had been stayed by the Court of Appeals for the Second Circuit, pending the Supreme Court's determinations on the seven petitions for certiorari. *See* Court of Appeals' Orders of July 17, 1987 and August 7, 1987; Fed.R.App.P. 41(b). The stay of the mandates was lifted on June 30, 1988 upon denial of the last petitions for certiorari. The case has now been returned to this court for determinations required on remand by the decisions of the Court of Appeals and for implementation of the plan for distribution of the settlement fund.

This order makes necessary modifications to this multidistrict court's earlier order, *In re "Agent Orange" Product Liability Litigation*, 611 F.Supp. 1396 (E.D.N. Y.1985), on distribution of the Agent Orange settlement fund. These modifications are required in light of the rulings of the court of appeals and subsequent developments. In particular, the affirmance of the grant of summary judgment against plaintiffs who opted out of the class, and the disapproval of the proposed form of the Class Assistance Foundation, require reconsideration of aspects of the distribution plan. *See In re "Agent Orange" Product Liability Litigation*, 611 F.Supp. 1223 (E.D.N.Y.1985), *aff'd*, 818 F.2d 187 (2d Cir. 1987), *cert. denied sub nom. Lombardi v. Dow*, — U.S. —, 108 S.Ct. 2898, 101 L.Ed.2d 932 (1988) (opt-outs); *In re "Agent Orange" Product Liability Litigation*, 611 F.Supp. 1396 (E.D.N.Y.1985), *aff'd in part, rev'd in part*, 818 F.2d 179, 184–86 (2d Cir.1987) (addressing, *inter alia*, Class Assistance Foundation).

The court now (1) orders that the opt-out claimants and the claimants who filed late be included within the class which may receive benefits of the Agent Orange Settlement Fund, (2) makes modifications to the Payment Program, (3) appoints a claims administrator for the Payment Program, (4) appoints a Special Master for Appeals from denials of Payment Program benefits, (5) establishes the basis for a set of Class Assistance Programs in place of the Class Assistance Foundation, (6) formally appoints Veterans Advisory Boards for the Payment Program and the Class Assistance Program, (7) takes steps for the prompt funding of projects designed to assist the class, (8) establishes a reserve fund, (9) appoints investment managers and a depositary to hold funds subject to the court's control, (10) appoints an accounting consultant, and (11) reallocates the settlement fund in light of the decisions of the court of appeals and in order to distribute the interest earned during the appeals.

I. PROCEDURAL HISTORY

A. *Post–Settlement*

Early on the morning of May 7, 1984, the class of veterans exposed to Agent Orange reached a $180 million settlement with the several defendant chemical companies. No payments could be made from the settle-

ment fund to class members or to plaintiffs' attorneys because of the pendency of the appeals. Investment of the settlement funds during the period from settlement on May 7, 1984 to the present has yielded interest which has increased the total amount of the fund from the original $180 million to some $240 million, after payment of interim expenses.

Following the settlement, the court held extensive hearings on the fairness and adequacy of the settlement, in New York, Chicago, Houston, Atlanta and San Francisco, at which some 500 witnesses were heard. The court has considered hundreds of additional written communications from veterans, members of their families, veterans' organizations, and others.

In September of 1984 the court issued a preliminary memorandum and order approving the settlement as fair, reasonable and adequate under the circumstances. *See In re "Agent Orange" Product Liability Litigation*, 597 F.Supp. 740 (E.D.N.Y. 1984) (Preliminary Memorandum and Order on Settlement). After the further determinations required by that order were made —the plan for distribution to eligible class members and the amount of reasonable attorneys' fees awards to plaintiffs' attorneys—final approval of the settlement was granted. *See In re "Agent Orange" Product Liability Litigation*, 611 F.Supp. 1396 (E.D.N.Y.1985) (Memorandum, Order and Judgment on Distribution of the Settlement Fund), *aff'd in part, rev'd in part*, 818 F.2d 179 (2d Cir.1987); *In re "Agent Orange" Product Liability Litigation*, 611 F.Supp. 1296 (E.D.N.Y.1985) (Memorandum and Order on Attorney Fees as Modified and Final Judgment), *aff'd in part, rev'd in part*, 818 F.2d 216 (2d Cir.1987) and 818 F.2d 226 (2d Cir.1987), *cert. denied sub nom. Newton Schwartz v. Dean*, —— U.S. ——, 108 S.Ct. 289, 98 L.Ed.2d 249 (1987).

The original total settlement was $180 million. Since that time, the funds have been held by the Clerk of the Court for the Eastern District of New York, and additional interest has been earned, bringing the total to approximately $240 million on June 30, 1988. On the advice of Special Master for Investment Policy Richard Davis, Esq. and financial consultants to the court, the court has directed that investments be made in short-term federal Treasury Bills for maximum security and liquidity. These consultants and Special Master Davis gave extensive time to the investment and fund protection problems without any receiving fees or reimbursement for expenses. The court is grateful for these unselfish services as well as for the assistance provided by the advisors and consultants named in the body of this opinion and by the numerous persons who advised the court at hearings and by letters.

### B. *Appeals*

Appeals were taken from numerous orders including the orders certifying the class action, approving the settlement, outlining the distribution plan, awarding counsel fees, granting summary judgment against the opt-out claimants, dismissing untimely claims, dismissing all the claims against the United States, and unsealing discovery materials.

In nine unanimous opinions dated April 21, 1987 a panel of the Second Circuit Court of Appeals disposed of all of the numerous individual appeals except those from the order of the district court providing for public access to documents sealed from public view during the discovery phase of the litigation. Following the denial of several petitions for rehearing and for rehearing *en banc*, six petitions for writs of certiorari were filed with the Supreme Court by the opt-out plaintiffs, by class members who objected to the settlement and distribution, by other plaintiffs whose claims were dismissed, and by one of plaintiffs' attorneys who sought reversal of the appellate court's rulings on counsel fees. The petitions for writs of certiorari were all denied by the Supreme Court. *See In re "Agent Orange" Product Liability Litigation*, 818 F.2d 145 (2d Cir.1987) (affirming class certification and approving of settlement), *cert. denied sub nom. Pinckney v. Dow*, —— U.S. ——, 108 S.Ct. 695, 98 L.Ed. 2d 648 (1988), and *Krupkin v. Dow*, —— U.S. ——, 108 S.Ct. 2899, 101 L.Ed.2d 932 (1988); 818 F.2d 179 (2d Cir.1987) (approving Payment Program but rejecting Class Assistance Foundation); 818 F.2d 187 (2d

Cir.1987) (affirming summary judgment entered against opt-out plaintiffs on ground of government contractor defense), *cert. denied sub nom. Lombardi v. Dow*, —— U.S. ——, 108 S.Ct. 2898, 101 L.Ed.2d 932 (1988); 818 F.2d 194 (2d Cir.1987) (affirming dismissal of Federal Tort Claims Act claims of servicemen and their relatives against the United States, on the grounds that they are barred by the *Feres* doctrine and by the discretionary function exception to the Federal Tort Claims Act); 818 F.2d 201 (2d Cir.1987) (affirming dismissal of "direct" claims against United States brought by wives and children of servicemen, on *Feres* grounds), *cert. denied sub nom. Adams v. United States*, —— U.S. ——, 108 S.Ct. 695, 98 L.Ed.2d 647 (1988); 818 F.2d 204 (2d Cir.1987) (affirming dismissal of claims of "Agent Orange" manufacturers against United States for contribution and indemnity for the class action settlement payments); 818 F.2d 210 (2d Cir.1987) (affirming dismissals of Hawaiian civilians' actions against the United States and the chemical companies), *cert. denied sub nom. Fraticelli v. Dow*, —— U.S. ——, 108 S.Ct. 695, 98 L.Ed.2d 648 (1988); 818 F.2d 216 (2d Cir.1987) (rejecting plaintiff class' attorneys' fee-sharing agreement and reinstating fee award determined by district court), *cert. denied sub nom. Newton Schwartz v. Dean*, —— U.S. ——, 108 S.Ct. 289, 98 L.Ed.2d 249 (1987); 818 F.2d 226 (2d Cir.1987) (approving district court's calculations of attorneys' fee awards, with abrogated award reinstated), *cert. denied sub nom. Newton Schwartz v. Dean*, —— U.S. ——, 108 S.Ct. 289, 98 L.Ed.2d 249 (1987).

In an opinion dated June 10, 1987, a separate panel of the court of appeals affirmed the district court's order unsealing materials produced or generated during discovery in the Agent Orange litigation. Defendants filed a petition for writ of certiorari with the Supreme Court, which was denied on November 17, 1987. *See In re "Agent Orange" Product Liability Litigation*, 104 F.R.D. 559, 562 (E.D.N.Y.1985) (Magistrate's Pretrial Order No. 33, dated December 17, 1984) ("Protective Orders Opinion"), *aff'd*, 821 F.2d 139 (2d Cir.1987), *cert. denied sub nom. Dow v. Ryan*, —— U.S. ——, 108 S.Ct. 344, 98 L.Ed.2d 370 (1987).

### C. *Post–Appeal Hearings and Advisory Boards*

Following the April 1987 opinions of the court of appeals, this court held a public hearing on distribution on May 26, 1987. Members of the bar, individual class members, representatives of veterans' organizations, and others participated.

Beginning in September of 1987, the court convened a representative Class Assistance Advisory Board to advise the court on the best ways to allocate the monies originally designated for the Foundation. Members of the Class Assistance Advisory Board are:

* Reverend Robert Certain, Minister of an Episcopal Church in Memphis, Tennessee. Rev. Certain flew B–52 missions in Vietnam during 1971–72; he was shot down in 1972 and made a Prisoner of War for 102 days until his release in March of 1973. He was awarded a Purple Heart and remains a member of the armed forces reserves. Rev. Certain is also involved in establishing a Vietnam veterans memorial in Memphis.

* Steven Champlin, aide to U.S. House of Representatives Majority Whip, Rep. Tony Coelho. Mr. Champlin is not a veteran, but has been deeply involved with Vietnam veterans affairs for many years. He is the author (with Rep. David Bonior and Tim Kolly) of *The Vietnam Veteran: A History of Neglect.*

* Ron Gardner, Assistant Vice Chancellor for Clinical Affairs, Louisiana State University Medical Center in New Orleans, Louisiana. Mr. Gardner served in Vietnam as a combat medic and a military policeman during 1970–72, and has since worked for the Ford, Carter and Reagan Administrations on veterans' medical needs. He is also involved in the establishment of a Vietnam veterans memorial in New Orleans.

* Charles T. Hagel, President, United Service Organization ("USO"). Mr. Hagel is a former Deputy Director of the Veterans Administration. He was a Sergeant in the U.S. Army and served with the 9th Infantry Division in Vietnam in 1967–68; he earned two Purple Hearts, the Army Commendation Medal, and several other honors for his service. Since 1985, Mr. Hagel has served as Chair of the Agent Orange Payment Program Veterans Advisory Board. In addition, he is actively involved with the Vietnam Women's Memorial Project, Inc., the National Advisory Committee of the Friends of the Vietnam Veterans Memorial and the Veterans Administration Vietnam Veterans Readjustment Advisory Committee. Just prior to his election as President of the USO in early 1987, Mr. Hagel was co-founder, Director and Executive Vice President of Vanguard Cellular Systems, Inc.

* Mary Lou Keener, Esq., attorney in private practice in Atlanta, Georgia, specializing in medical malpractice and personal injury cases. Ms. Keener was a U.S. Navy nurse in Vietnam from 1968–69, and later became a Professor of Nursing at Georgia State University. After her service in Vietnam she returned to Washington, D.C. to work for U.S. Rep. D.W. Riegle. Ms. Keener is currently a Lt. Colonel in the U.S. Air Force Reserve Nurse Corps. She has been involved in a variety of Vietnam veterans activities, including serving as Vice-Chair of the National Veterans Leadership Program from 1985–86 and as Chair of the Board of Directors of the Georgia Vietnam Veterans Leadership Program from 1984–86.

* Gary May, clinical social worker, Evansville, Indiana. Mr. May was a U.S. Marine in Vietnam in 1968, until he lost both his legs in a landmine explosion. He has worked with the Veterans Administration and the Vet Center Program, and now practices private social work while teaching at the University of Southern Indiana. Much of his current social work involves counseling Vietnam veterans and their families.

* Frank McCarthy, President, Vietnam Veterans Agent Orange Victims International, Inc. (VVAOVI), Stamford, Connecticut. Mr. McCarthy served in the 1st Infantry Division in Vietnam from 1965–67 until an injury forced his return to the United States; he received a Purple Heart, a bronze star, and several other decorations. The VVAOVI organization focuses on assisting Vietnam veterans and their families. He also heads the Brandie Schieb Fund, which assists Vietnam veterans' children born with birth defects. Before taking office as President of VVAOVI in 1978, Mr. McCarthy was President of Artasion Productions, Inc., a documentary and feature film production company. Mr. McCarthy has played a central role in the Agent Orange Litigation since its inception.

* Jan Ott, nurse in private practice, Seattle, Washington. She has worked as a psychiatric clinical nurse specialist and has been a consultant to the Veterans Administration Medical Center in Seattle. Ms. Ott served in the U.S. Army in Vietnam in 1970–71 as an emergency room triage nurse at the 67th Evacuation Hospital. She has experience in counseling veterans with post-traumatic stress disorder (PTSD), and was a member of the First National Women's Working Group on Veterans Issues.

* Hon. Matthew Railey, District Judge, Fourth Judicial District of the State of Colorado, Colorado Springs, Colorado. Judge Railey served in the U.S. Army in Vietnam as a member of the Judge Advocate General's Corps from 1970–71; he frequently defended "fraggers" (soldiers accused of directing fire toward their own officers). He was awarded two bronze stars. Judge Railey has been very active in community affairs, and is particularly active in community legal services programs and criminal justice issues.

* Dr. Oscar Salvatierra, M.D., Professor of Surgery and Urology and Chief of the Transplant Service at the University of California at San Francisco. Dr. Salvatierra was a U.S. Army urologist and surgeon at the 8th Field Hospital in Vietnam and at hospitals in Nha Trang, Vietnam during 1966–67; he received the Army commendation medal and several other honors. He is particularly active in the area of organ transplants and is Past President of the American Society of Transplant Surgeons, a member of the Board of Governors of the American College of Surgeons, and a member of the National Kidney and Urologic Diseases Advisory Board, as well as many other medical societies. He has also done work with the National Institutes of Health.

* Solomon Watson IV, Esq., Secretary and Assistant General Counsel of the New York Times Company, New York, New York. Mr. Watson served in the Ninth Infantry Division of the U.S. Army as a lieutenant in the military police from 1967–68. He was awarded two bronze stars and two Army commendation medals. His brother, a marine, was killed in service in Vietnam. Mr. Watson now serves on the board of the New York Vietnam Veterans Leadership Program, Inc., which assists veterans seeking job placements. He has also helped in the production of a television film about Vietnam veterans.

* Joseph Zengerle, Esq., attorney in private practice, Washington, D.C. Mr. Zengerle attended the U.S. Military Academy at West Point and served in Vietnam from 1967–68 as Special Assistant to General Westmoreland, including during the Tet Offensive, and also as a unit commander in I Corps at Da Nang. He received a bronze star. He clerked for Chief Justice Burger on the United States Supreme Court in 1973–74 and was Assistant Secretary of the Air Force under President Carter. In private practice, Mr. Zengerle continues to do much pro bono work for veterans, including serving on the Vietnam Veterans Memorial National Board and handling cases for veterans suffering from post-traumatic stress disorder. Mr. Zengerle had devoted extensive time and effort to setting up the proposed Foundation (see part IV–A, *infra*). This arduous work, accomplished at the court's request, provided valuable information that is being used in current planning.

This group served without fee or compensation for their time. The Board met with the court, Special Master Kenneth Feinberg and consultant Ira Hirschfield, a nationally recognized expert on foundations and methods of allocating private non-profit resources, to develop the Class Assistance Program. This program is described in section IV–B–2 below.

In addition, a second group of veterans met repeatedly over a number of years with Special Masters Kenneth Feinberg and Richard Davis to consider the details of the Payment Program. Members of this Payment Program Advisory Board are:

* Donna–Marie Boulay, Esq., an attorney in private practice in Minneapolis, Minnesota. Ms. Boulay served as a Captain in the U.S. Army Nurse Corps from 1966–68, including one year in Vietnam. Her legal work focuses on problems in the health care industry. She has had a fundamental role in establishing the Vietnam Women's Memorial Project.

* Albert S. Dandridge, III, Esq., an attorney in private practice in Philadelphia, Pennsylvania. Mr. Dandridge served in combat with the U.S. Marine Corps in Vietnam during 1964–65 and 1968–69. Before entering the private practice of law, he was a Special Counsel at the Securities & Exchange Commission.

* Charles T. Hagel, President of the USO. Mr. Hagel also serves on the Class Assistance Advisory Board, and his background is discussed above.

* Vincent J. Martin, Jr., an account executive at a large investment bank in Paramus, New Jersey. He was a

First Lieutenant in the U.S. Army and served as a Recon Platoon Leader and Company Commander of the 2nd Battalion, 27th Infantry in Vietnam during 1968–69.

* John L. McElrath, a principal and division director of Management Systems Designers, Inc., a company specializing in automated data processing operations in Virginia. He has managed such operations for the distribution of class action settlement funds in other litigations, and has devoted significant time and effort to assisting the court in designing the Agent Orange Payment Program. Mr. McElrath served as a Sergeant in the U.S. Marine Corps in Vietnam from 1966–68, stationed with I Corps and in Saigon.

Mr. Hagel served as chair. This group met on many occasions, without compensation. It assisted in developing the complex program for investing and paying out funds, considered many possible contractors, and advised on retention of the contractors who will execute the Payment Program. These arrangements are described in parts III–B and V, below.

The court is most grateful for the unselfish and uncompensated contributions of those just listed and the many others who have advised the court. The court is especially grateful to Charles Hagel and Joseph Zengerle, who met repeatedly with the court and Special Master Feinberg, both in person and by telephone, and thereby provided extraordinary assistance to the class.

This order is based upon the court's hearings, on its oral consultations with the assembled Advisory Boards, and on the communications it has received in writing. It sets out the manner in which the settlement fund is to be allocated. The court urges all those in a position to do so to assist it in expediting payments to members of the class.

## II. SUMMARY OF ALLOCATION OF FUNDS

General principles and specific suggestions for distribution were put forward at the 1984 Fairness Hearings. *See In re "Agent Orange" Product Liablity Litiga-*

*tion,* 597 F.Supp. 740, 858–61 (E.D.N.Y. 1984). The district court held a hearing on proposals for a distribution plan on March 5, 1985 and also considered voluminous written submissions, and issued its distribution order on May 28, 1985. *See id.,* 611 F.Supp. 1396 (E.D.N.Y.1985). Now that appeals have been completed, numerous questions concerning distribution remain to be resolved on remand. The court held an additional hearing on distribution on May 26, 1987, shortly after the court of appeals' nine decisions were announced. The court has convened the two Advisory Boards composed of veterans mentioned above, and has worked with those boards, with the Special Masters, and with numerous advisors to design a distribution plan that will simultaneously meet the needs of the class and comport with legal policy as determined by the court of appeals.

### A. *Original and Revised Payment Program*

In May of 1985 the court issued an order directing distribution of approximately three-quarters of the fund (approximately $130 million of the original $180 million total) to a Payment Program which would compensate individual veterans and their family members in the form of disability benefits to 100% disabled veterans and payments of death benefits to the families of deceased veterans. *See In re "Agent Orange" Product Liability Litigation,* 611 F.Supp. 1396 (E.D.N.Y.1985), *aff'd in part, rev'd in part,* 818 F.2d 179 (2d Cir.1987). The Payment Program was designed to run for ten years, beginning January 1, 1985 and ending December 31, 1994.

The Payment Program was intended to provide annual payments to veterans for past and future continuous disabilities. Vietnam veterans exposed to Agent Orange who suffered total (100%) disabilities arising from non-traumatic, non-accidental and non-self-inflicted causes would be eligible for payments. *See id.,* 611 F.Supp. at 1412. The definition of total disability was taken from the Social Security Act, and Social Security Administration determinations of disability would be taken as evidence of disability for the Agent Orange

Payment Program. Independent determinations of disability would be made for veterans who had not obtained a Social Security ruling. *See id.* at 1412–13. Variation in the award would be based on age at the onset of disability, duration of disability, and the year of occurrence. Extension of the Payment Program over a ten year period, beginning January 1, 1985, would permit the inclusion of veterans not disabled at the time the program began and would maximize the amount available for payment. *See id.* at 1417–1422, *aff'd in relevant part,* 818 F.2d 179, 183–84 (2d Cir.1987). Based on a variety of data, the court estimated the kinds of payment amounts the original (1985) Payment Program would entail. These estimates were only that, and did not purport to specify actual award levels or in any way bind the court to eventual payments. The court estimated that the maximum disability award, for a veteran disabled in 1970 and continuously disabled through 1995, would be a total of $12,790.00, distributed over the ten years of the program. For disabilities incurred later and lasting fewer years, payments would be correspondingly smaller. *See id.,* 611 F.Supp. at 1418–20.

In addition, death benefits were to be paid in a lump sum to the surviving spouses or dependent children of veterans who died before the Payment Program began and, in lesser amounts, to survivors of veterans who die during the years of operation of the Payment Program. *See id.* at 611 F.Supp. 1420–22, *aff'd in relevant part,* 818 F.2d 179, 183–84 (2d Cir.1987). Death benefits would not be paid for deaths arising out of traumatic, accidental or self-inflicted causes. In its 1985 order, the court estimated that the maximum death benefit, for families of veterans who died before 1985, would be approximately $3,400.00, paid in one lump sum. Families of veterans who died during the ten years of the program would receive proportionately smaller sums. *See id.,* 611 F.Supp. at 1420–21.

The court orders that the Payment Program now created will operate along the same standards for eligibility and methods of computing benefits as the program originally proposed. The total sum now allocated to this portion of the settlement distribution must be increased, however, because of interest earned and the court of appeals' suggestion that it looks more favorably on this part of the program than it does on the class assistance portion of the program. $170 million is now allocated to this portion of the program, plus interest earned on this sum in the future. As indicated below, this sum may be increased or decreased by shifts in funds from or to other programs. Individual payments to claimants will be adjusted to take into account this increased sum and the other modifications described in part III, *infra.* The court reserves the power to modify or adjust all of these arrangements should the number of eligible claimants or other variables substantially depart from current estimates.

### B. *Australian and New Zealand Class Members*

The distribution plan allocated two percent of the fund (now approximately $240,000,000) for class members from Australia (1.8%) and New Zealand (0.2%). The percentage allocated to these veterans reflects the percent of exposed Vietnam veterans from the Australian and New Zealand armed forces. Australian members of the class will receive $4,500,000 U.S. and New Zealand veterans $500,000 U.S. These figures are rounded off to the next highest half million.

These veterans are not covered by the Payment Program but instead are to be paid in accordance with distribution plans adopted by the trustees of special trust funds created for that purpose in each country. *See In re "Agent Orange" Product Liability Litigation,* 611 F.Supp. 1396, 1443–45 (E.D.N.Y.1985), *aff'd in relevant part,* 818 F.2d 179 (2d Cir.1987). Responsible people in those two countries are obviously in a better position than this court to develop the details of local distribution.

Distribution plans have been developed in both countries. Upon court order after written request of lawful representatives of these two special trust funds, the depositary shall:

(1) deliver a check for $4,500,000 U.S. (or its equivalent in Australian currency) to the Consul General of Australia made payable to The Australian Trust Fund or its lawful designee; (2) deliver a check for $500,000 U.S. (or its equivalent in New Zealand currency) to the Consul General of New Zealand made payable to The New Zealand Trust Fund or its lawful designee.

## C. *Class Assistance Program*

The remainder of the fund, originally $45 million, was directed to the endowment of a Class Assistance Foundation "to fund projects and services that will benefit the entire class." *In re "Agent Orange" Product Liability Litigation*, 611 F.Supp. 1396, 1432 (E.D.N.Y.1985). The class includes all Vietnam veterans who may have been exposed to "Agent Orange" and related phenoxy herbicides in Vietnam, and the family members of such veterans. The class is therefore significantly larger than the group of people who have filed claims as part of the Payment Program. The Payment Program and the Foundation were designed in tandem to maximize the benefit to the class of a multimillion dollar fund that might otherwise degenerate into some quarter of a million small awards incapable of providing any real aid to any class member (amounting to only about $80 each).

Through the funding of services, the Foundation would have offered "some benefit from the settlement" to the majority of claimants who will not meet the eligibility requirements for cash compensation under the Payment Program. 611 F.Supp. at 1431. More generally, the Foundation was intended to fund services, under the court's control, for the benefit of all members of the class, including all Vietnam veterans who may have been exposed to Agent Orange and the families of those veterans. Funding priority was directed to the benefit of children with birth defects born to class member veterans, reflecting the agreement within the class that the fund should be used to aid the children with birth defects and their families. The Foundation was also directed to fund other projects in the areas of health, counseling,

and the provision of services which were designed to benefit the class or sub-classes, including the many members of the class who remain outside the mainstream of society. *See In re "Agent Orange" Product Liability Litigation*, 611 F.Supp. 1396, 1432–34 (E.D.N.Y.1985), *aff'd in part, rev'd in part*, 818 F.2d 179, 184–86 (2d Cir.1987).

This portion of the program must be modified in view of the court of appeals' decisions. The court of appeals expressly approved the concept of funding such services, but disapproved the specific Foundation mechanism. *See In re "Agent Orange" Product Liability Litigation*, 818 F.2d 179, 184–86 (2d Cir.1987). Although the court of appeals rejected the original foundation proposal, it "explicitly note[d] ... that the district court may in the exercise of its discretion and after consultation with veterans' groups undertake to use portions of the funds for class assistance programs that are consistent with the nature of the underlying action and with the judicial function. Accordingly, the district court on remand may designate in detail such programs and provide for their supervision." *Id.*, 818 F.2d at 186.

A sum of $40 million plus interest earned from this date is immediately allocated to this portion of the program, to be devoted to service programs for the benefit of the entire class. This "Class Assistance Program" will be administered and monitored by the court, in accord with the direction of the court of appeals. *See id.*; *see infra* Part IV.

In addition, a sum of $10 million must, in accordance with the settlement agreement, be placed in reserve for a period of twenty-five years from the date of the settlement. The court will retain discretion over this reserve. Under the terms of the Settlement Agreement, this reserve will be used to cover possible claims in state courts. It will be available to compensate injured Vietnam veterans exposed to Agent Orange, should future evidence indicate a legally cognizable link between Agent Orange exposure and specific ailments. While it is unlikely that claims will be via-

ble in state courts in view of the court of appeals' holding that there is no basis for the claims, this sum will be invested in reserve against that possibility. At the end of the reserve period, the sum will be added to whatever remains of the $40 million now set up for the Class Assistance Program, as described *infra.* Interest earned on the $10 million reserve will be regularly transferred to the Class Assistance Program for distribution through that Program, as the court determines.

Any funds remaining after paying costs of administration of the entire settlement fund will be added to the Class Assistance Program. This remainder is currently estimated to be on the order of $2 million. Thus, a total of some $52 million plus interest, including the $10 million reserve, will ultimately be available for the Class Assistance Program. The court reserves the power to transfer any portion of these funds to the Payment Program. *See* Part II–A, *supra.*

### D. *Attorneys' Fees and Expenses*

The original total of allowed attorneys' fees and expenses was $10,767,443.63 plus interest accrued since the final judgment on June 18, 1985. *See In re "Agent Orange" Product Liability Litigation,* 611 F.Supp. 1296, 1346 (E.D.N.Y.1985) (Memorandum and Order on Attorney Fees as Modified and Final Judgment), *aff'd in part, rev'd in part,* 818 F.2d 216 (2d Cir. 1987), and 818 F.2d 226 (2d Cir.1987), *cert. denied sub nom. Newton Schwartz v. Dean,* — U.S. ——, 108 S.Ct. 289, 98 L.Ed.2d 249 (1987). The court of appeals generally approved the fee awards listed at 611 F.Supp. 1344–46, with certain revisions: an adjustment of the division of the attorney fees and expenses among the members of the Plaintiffs Management Committee, and an adjustment of the fee of one fee claimant, Ashcraft & Gerel. As to the latter, the court of appeals eliminated the district court's offset against Ashcraft & Gerel to reimburse the class for discovery materials used by the firm in assisting the claims of the opt-outs. *See id.,* 818 F.2d at 238–39.

The appeals have not appreciably increased the total fees awarded. Because of the elimination of the offset against Ashcraft & Gerel, the grand total of attorneys' fees and expenses is now $10,906,-331.63, plus interest from June 18, 1985. The average rate of interest earned on the Agent Orange Settlement Fund is over 6.9%. To simplify computations, the clerk, in making payments to attorneys, shall add interest of 7% from June 18, 1985 (the date attorneys' fees were finally ordered) until July 1, 1988. *See* 611 F.Supp. 1329, 1346. The total payable as attorneys fees and expenses with interest will therefore be approximately $13,225,000.00. Even at the time of determination of the attorney fee awards in 1985, the settlement fund had already earned over $15,000,000.00 in interest—more than enough to pay the total fees and expenses allowed without impairing the original fund of $180,000,000.00. *See* 611 F.Supp. 1296, 1301.

Pursuant to the court's order, any counsel receiving a fee is deemed to waive any private contractual right to a fee; if such a private fee was received it must be returned to the client before payment is sought. *See* 611 F.Supp. 1318. If the client cannot be located, compliance by paying the fee into the court for the Agent Orange Fund or deducting the fee from the request for payment from the clerk will suffice.

Attorneys are also reminded that they must file with the clerk, at their own expense, any discovery materials in their possession before receiving their fee award. *See* 611 F.Supp. 1346. These materials should be suitably boxed and indexed so that they can conveniently be made part of the Agent Orange files to be available to the public in a depository chosen by the court. Materials not received in suitable form will be rejected by the Clerk of the Court.

### E. *Division of Funds*

Summarizing these decisions, present funds are allocated as follows (rounded to the nearest million):

| Purpose | Amounts |
| --- | --- |
| Payment Program (Death and Permanent Total Disability) | $170,000,000 |

| Purpose | Amounts |
|---|---|
| Class Assistance Program | $52,000,000 |
| Australian and New Zealand Trusts | 5,000,000 |
| Attorneys' Fees and Expenses with Interest | 13,000,000 |
| Total | $240,000,000 |

## III. PAYMENT PROGRAM

The main features of the Payment Program, having been approved by the court of appeals, will be retained in their original form, except that the amount of money in the Payment Program will increase from its original planned sum in 1985. These features and the sums slated for disbursement are described at parts II–A and II–B, *supra.* This section describes the alterations and modifications to that program now adopted by the court.

### A. *Inclusion of Opt–Out Claimants and Late Claimants*

Under the terms of the court of appeals' affirmances, those plaintiffs who opted out of the class on the advice of counsel would be entitled to no recovery. *See In re "Agent Orange" Product Liability Litigation,* 611 F.Supp. 1223 (E.D.N.Y.1985) (Opt–Out Opinion); 611 F.Supp. 1267 (E.D.N.Y.1985) (Lilley Opinion), *aff'd,* 818 F.2d 187 (2d Cir.1987) (approving grants of summary judgment against opt-out plaintiffs), *cert. denied sub nom. Lombardi v. Dow,* — U.S. —, 108 S.Ct. 2898, 101 L.Ed.2d 932 (1988). As of May 7, 1984, the date of the settlement, 2,440 requests for exclusion from the class had been received by the Clerk of the Court. *See In re "Agent Orange" Product Liability Litigation,* 597 F.Supp. 740, 756 (E.D.N.Y.1984). This is almost precisely one percent of the 244,162 timely filed claims.

As noted in part II–D, *supra,* the opt-out plaintiffs' attorneys will now receive substantial legal fees and expenses for work done on behalf of the class pursuant to the order of the court of appeals. *See In re "Agent Orange" Product Liability Litigation,* 818 F.2d 216 (2d Cir.1987) (rejecting attorneys' fee sharing agreement), *cert. denied sub nom. Newton Schwartz v. Dean,* — U.S. —, 108 S.Ct. 289, 98 L.Ed.2d 249 (1987); 818 F.2d 226 (2d Cir.1987) (approving district court's award of attorneys' fees), *cert. denied sub nom. Newton Schwartz v. Dean,* — U.S. —, 108 S.Ct. 289, 98 L.Ed.2d 249 (1987). Those attorneys have not moved to obtain benefits from the settlement for their clients. To protect these opt-out veterans, the court is now compelled to act on its own motion.

In view of the special obligation of the court to veterans and their families, the court inquired of class members present at the May 26, 1987 hearing on implementation whether those who opted out should now "be permitted to opt in so they (or their families) can share equally with those who were their comrades-in-arms?" *See* Memorandum and Order dated April 23, 1987, No. MDL–381 (E.D.N.Y.1987). Unanimously, veterans, representatives of veterans' organizations, and the veterans' attorneys have answered this question in the affirmative.

■ Equity requires that those who opted out of the class on the advice of counsel for the opt-outs be given the opportunity to be reinstated as members of the class. Inclusion of all the opt-out claimants would not result in any substantial dilution of the fund. Reinstatement now, while not required, is consonant with the court's grants of requests for reinstatement which were received prior to the settlement, and is desirable in light of the fact that these plaintiffs have been barred from any recovery as a result of the advice of their attorneys and the rulings of the court of appeals which were unfavorable to them. *See In re "Agent Orange" Product Liability Litigation,* 818 F.2d 187 (2d Cir.1987). The court has previously indicated that it would consider sympathetically the numerous late applications to rejoin the class received after settlement and after the fairness hearings. *See id.,* 597 F.Supp. 740, 756–57.

The affirmances are dispositive of 287 appeals in cases brought by opt-out plaintiffs against whom summary judgment was granted. *See In re "Agent Orange" Product Liability Litigation,* 611 F.Supp. 1223 (E.D.N.Y.1985); *Lilley v. Dow Chemical Co.,* 611 F.Supp. 1267 (E.D.N.Y.1985), *aff'd sub. nom. In re "Agent Orange" Product*

*Liability Litigation*, 818 F.2d 187 (2d Cir. 1987), *cert. denied sub nom. Lombardi v. Dow*, — U.S. —, 108 S.Ct. 2898, 101 L.Ed.2d 932 (1988). The court of appeals affirmed the grants of summary judgment against the opt-outs on the grounds that: (1) the military contractor defense provides a shield from "liability for injuries caused by products ordered by the government for a distinctly military use;" and (2) "the chemical companies ... could not have breached a duty to inform the government of hazards" resulting from exposure to Agent Orange since "[e]ven today, the weight of present scientific evidence does not establish that Agent Orange injured personnel in Vietnam, even with regard to chloracne and liver damage." *In re "Agent Orange" Product Liability Litigation*, 818 F.2d 187, 190 (2d Cir.1987), *cert. denied sub nom. Lombardi v. Dow*, — U.S. —, 108 S.Ct. 2898, 101 L.Ed.2d 932 (1988). Some of the remaining opt-outs apparently have never filed suit; if they do, their cases will be governed by the unfavorable rulings of the affirmances. *See In re "Agent Orange" Product Liability Litigation*, 611 F.Supp. 1223, 1230 (E.D.N.Y. 1985), *aff'd*, 818 F.2d 187, 189 (2d Cir.1987).

Notice of this order shall be given by their attorneys to any opt-out plaintiffs they represent in order that they may consider whether they wish to submit requests for continued exclusion from the class. Requests for exclusion must be received by the court by January 1, 1989 (which is also, as indicated below, the deadline set for filing late claims). Failure to request exclusion in writing by January 1 will be deemed a request for reinstatement into the class—a request that will be deemed automatically granted.

■ Late claims filed before January 1, 1989 will also be accepted for inclusion within the class of claimants against the settlement fund. The equities with regard to late claims compellingly favor inclusion. The late claimants are class members who were eligible to file their claims but did not do so until after this court's May 28, 1985 order on distribution of the fund. Publicity concerning the court's distribution opinion and the extensive appeals has generated

thousands of inquiries to the court and is primarily responsible for the filing of approximately 3,500 late claims. As was the case with claimants who missed the original filing deadline, these individuals cite as common reasons for their failure to file timely claims that they were unaware: "(1) of the lawsuit or (2) of the need to file a claim, or (3) of the deadline itself." *In re "Agent Orange" Product Liability Litigation*, 611 F.Supp. 1396, 1417 (E.D.N.Y. 1985). The court had already extended the deadline to include as timely "all claims filed by the date of this opinion," *id.* at 1417 (extending deadline to May 28, 1985).

■ As the court of appeals noted in one of the affirmances, a "district court overseeing settlement distribution has inherent power to accept late claims despite contrary terms of agreement." *In re "Agent Orange" Product Liability Litigation*, 821 F.2d 139, 145 (2d Cir.1987) (citing *Zients v. LaMorte*, 459 F.2d 628, 629–30 (2d Cir.1972)). Since the settlement agreement here is not to the contrary, the issue is even simpler. "Until the fund created by the settlement is actually distributed, the court retains its traditional equity powers." *Zients v. LaMorte*, 459 F.2d 628, 630 (2d Cir.1972). *See also In re Gypsum Antitrust Cases*, 565 F.2d 1123, 1128 (9th Cir.1977); *In re Folding Carton Antitrust Litigation*, 557 F.Supp. 1091, 1103–04 (N.D.Ill.1983), *aff'd in pertinent part*, 744 F.2d 1252 (7th Cir. 1984), *cert. dismissed sub nom. G. Heilman Brewing Co., Inc. v. Folding Carton Administration Committee*, 471 U.S. 1113, 106 S.Ct. 11, 86 L.Ed.2d 269 (1985); *Seifer v. Topsy's International, Inc.*, 70 F.R.D. 622, 625 n. 1 (D.Kan.1976).

The filing deadline for veterans who later learn of adverse health effects previously unknown to them remains 120 days from the date of discovery of the disability. *See, e.g., In re "Agent Orange" Product Liability Litigation*, 611 F.Supp. 1396, 1401 (E.D.N.Y.1985), *aff'd in relevant part*, 818 F.2d 179 (2d Cir.1987). Similarly, the deadline for claims filed by the survivors of veterans who later die is 120 days from the date of death. *See id.*, 611 F.Supp. at 1417. Thus the cutoff date for

filing a claim will be January 1, 1989, or 120 days after death or discovery of disability, whichever is later.

The cost to the fund of admitting late claimants and readmitting the opt-out claimants to the class action should be relatively small. No significant administrative costs need be incurred to allow the late claims and opt-out claims. The number of late claims and opt outs—approximately 3500 late claims to date and between 287 and 2440 opt-outs—is *de minimis* in relation to the roughly quarter of a million claims filed, though each claim is, of course, of considerable importance to the claimant.

The late claims and opt-out claims will be subject to the same requirements for qualification for the Payment Program and participation in the projects funded by the Class Assistance Programs as the other claimants. It is anticipated that the same approximate percentage of the late claims and the opt-out claims will qualify for cash payments as is true of the timely filed claims. "[A]llowing these ... claims would result in only a miniscule reduction in recovery by timely claimants." *Zients v. La-Morte*, 459 F.2d 628, 630 (2d Cir.1972). There can, therefore, be little prejudice to the claimants whose claims were timely filed by admission of these claimants to the class for consideration on an equal footing. Moreover, since no payments have yet been made to any claimants, earlier estimates of possible payment amounts did not confer on the early claimants any right to those particular amounts. Figures previously cited by the court as statistical approximations of the possible payment schedules do not vest in any individual claimant, or in the class as a whole, anything more than a generalized and unquantified expectation of payment to qualifying class members. *See In re "Agent Orange" Product Liability Litigation*, 611 F.Supp. 1396, 1419, 1423 (E.D.N.Y.1985). The equities require that the qualifying late claimants and opt-out claimants be permitted to participate in the fund.

## B. *Additions and Modifications*

### 1. Exposure Criteria

Exposure criteria must be chosen in order to meet the definition of the class and establish a claims procedure that compensates Vietnam veterans who probably were exposed to a herbicide in Vietnam. "Some substantial showing of exposure ... must be made to ensure that only class members who were exposed receive payment.... A presumption that all claimants were exposed is not workable [and] would be unfair to a truly exposed class member whose award otherwise would be higher." *In re "Agent Orange" Product Liability Litigation*, 611 F.Supp. 1396, 1415 (E.D.N.Y. 1985).

Selecting appropriate criteria for determining exposure, however, is not a simple task. "The events in question occurred many years ago, and exposure through ingestion of water or food is a matter of considerable speculation. Nevertheless, given the nature of the scientific evidence, the character of exposure is a critical element." *In re "Agent Orange" Product Liability Litigation*, 818 F.2d 145, 173 (2d Cir.1987). In addition, the scientific community has not reached a consensus on either the manner in which a veteran could have been exposed or the most appropriate way to assess exposure several years after the event. The court must choose a method of determining exposure which generates reliable and credible results at affordable cost.

The court's original distribution plan adopted, in part, a system in which computerized military records of the precise areas sprayed with Agent Orange (the "HERBS" tapes) were combined with the claimant's testimony on a claims questionnaire as to the veteran's locations and dates in service. *See* 611 F.Supp. at 1415–17. Under this system, the veterans' locations and times of service in Vietnam were compared to the spray dates and locations on the HERBS tapes to determine whether the veteran was located within a certain distance of the spray site either during or shortly after spraying. Both HERBS tapes—the tape recording aircraft spraying and the tape

**1264**

showing helicopter and backpack spraying —were employed in this procedure.

This method has shortcomings. The "HERBS" computer tapes are estimated to account for 86% of herbicide use in Vietnam; some spray areas are omitted. *See id.* at 1416. Claimants' own declarations about service in Vietnam may be inaccurate, or the information may be lost (particularly where the claim is made on behalf of a deceased veteran), or the information supplied may not be an acceptable basis for an award.

The HERBS matching mechanism is also of uncertain value because scientists dispute whether various methods of determining exposure can accurately identify veterans with unusually high blood levels of dioxin, the toxin contained in Agent Orange. For example, the Centers for Disease Control (CDC) has recently concluded that the use of certain military records does not reliably identify veterans who were exposed to Agent Orange. *See* Centers for Disease Control, Comparison of Serum Levels of 2, 3, 7, 8 TCDD with Indirect Estimates of Agent Orange Exposure in Vietnam Veterans (Aug. 1987) (hereinafter "CDC Study"). The CDC Study compared the blood dioxin levels of veterans identified as having served in sprayed areas with the blood dioxin levels of veterans who did not serve in Vietnam. The veterans deemed to have served in sprayed areas were selected based on an analysis of military records. The CDC found that Vietnam veterans whose records indicated service in sprayed areas had no higher dioxin blood levels than do veterans who did not serve in Vietnam. The CDC also tested other individuals known to have been exposed directly to Agent Orange and did find high levels of dioxin. In reviewing the CDC study, the Office of Technology Assessment ("OTA") (an independent Congressional research agency) concluded that "all the existing data support the fact that most ground troops in Vietnam did not have heavy Agent Orange exposure, and that those who might have would be exceptions." *See* Office of Technology Assessment Staff Paper, Reviews of CDC's "Comparison of Serum Levels of 2, 3, 7, 8, TCDD ..." and of "Proposed Protocol for the Women Vietnam Veterans Health Study," Special Projects Office of the Health Program, OTA (Sept. 1987), at 9 (emphasis removed).

In contrast, other researchers have concluded that blood tests for dioxin can be used to identify with accuracy those exposed to Agent Orange. *See* P. Kahn, *Dioxins in Dibenzofurans in Blood and Adipose Tissue of Agent Orange–Exposed Vietnam Veterans and Matched Controls*, 259 J.Am. Medical Ass'n 1661 (1988). Still others believe that anyone who served in Vietnam could have been exposed, either by direct contact or ingestion of contaminated food or water.

These exposure studies have shortcomings. They demonstrate the great difficulty of identifying exposed individuals some twenty years after the fact. They furnish one more reason for concluding that in almost no instance can causation of any disease be traced to Agent Orange exposure, at least based on present data. Since, however, distribution under the settlement agreement must proceed under the hypothesis that there is such a connection, some form of exposure requirement for eligibility is mandated. The court must act *as if* possible exposure to Agent Orange were equivalent to the absorption of a significant amount of dioxin and *as if* this absorption caused the veteran's death or disability.

■ The use of a questionnaire matched against the HERBS spray area data remains the most comprehensive mechanism for judging probable exposure to Agent Orange at moderate cost. This exposure evaluation system is most accurately described as a probability analysis. The test is not intended to prove, by a preponderance of the evidence, that certain individuals were or were not exposed. Rather, the test is intended to distinguish those most likely to have been exposed from those less likely to have been exposed. At the least, it will help distinguish those who might have been exposed from those who could not have been exposed, even if those exposed received no, or only insignificant, doses.

This mechanism will be employed by the Claims Administrator in screening claims, using the method described in this court's earlier opinion, *see* 611 F.Supp. at 1415–17. Claimants' questionnaires will be compared to the HERBS tapes to determine location, date and duration of presence in a sprayed area. Both the tapes for aircraft spraying and the tapes for helicopter and backpack spraying will be used in this matching procedure. Additional written evidence, as by affidavit of eyewitness observers, will also be accepted, unless military records clearly contradict this evidence.

As initially ordered, exposure will be extrapolated from location and timing without further consideration of the actual intensity of contact with Agent Orange. Some evidence does suggest that the intensity of contact may be related to the severity of injury. *See New Doubts Raised on Agent Orange,* N.Y. Times, Mar. 23, 1988, at A19, col. 1 (reporting that revisions of 1984 Air Force "Ranch Hand" study, taking account of "greater exposure" among "sloppier" handlers, show reduced confidence in original conclusion that Agent Orange could be "exonerated" as cause of various health problems). But this evidence is weak and imprecise, affording little basis for any realistic calibration of exposure level to compensation level. Moreover, linking compensation to intensity of exposure would require substantially greater expense in administering the Payment Program, and substantial costs to claimants in attempting to prove intense contact. These costs would be borne at little benefit to most claimants because only showings of intense exposure could support larger awards. Beyond the data culled from the HERBS tapes, therefore, intensity of exposure will not be considered in any payment decisions.

Pursuant to order of the court, Special Master Feinberg has entered into an Exposure Consultation Agreement with Dr. Jeanne Stellman of Columbia University and Dr. Steven Stellman, two acknowledged experts in the field. They will assist the Claims Administrator and the Special Master for Appeals. In particular, they will help prepare the claim questionnaire and the computerized index for matching locations and dates of service to the locations and dates of Agent Orange spraying. They will also prepare an index of locations of military units to assist claimants in providing information regarding the veterans' geographic zones of service.

Since the HERBS tapes are not perfect, and because equity requires a fair and compassionate claims procedure, other methods of proof must be available to claimants. Tests have been developed which measure the the presence of dioxin in the body. These tests show dioxin levels in fat tissues or in blood cells. Because dioxin is found in Agent Orange, presence of high levels of dioxin in the body—"substantially" higher than the background level of dioxin in those not exposed to Agent Orange—may indicate past exposure to Agent Orange. *See, e.g.,* CDC Study, *supra* (exposed Ranch Hand subjects show higher dioxin levels); *In re "Agent Orange" Product Liability Litigation,* Public Hearing held May 26, 1987, Transcript of Proceedings at 7–38 (Testimony of Allen Falk, Dr. Peter Kahn, Charles Pace, et al. regarding New Jersey testing programs); 79–88 (Testimony of Joseph Bangert regarding Massachusetts testing programs); 144–54 (Testimony of Victor Yannacone, Jr. regarding value of non-HERBS test methods). The court declines to adopt either the fat test or the blood test as the basic indicator of exposure because both are uncertain and expensive. Mandating these tests for all claimants would consume a large portion of the settlement fund. In addition, the tests are physically intrusive, and would burden many claimants with unpleasant medical examinations were the court to order such tests for all claims. Moreover, the fat and blood tests are useless for most deceased veterans' claims.

Nevertheless, claimants who wish to do so may submit results of either test to the Claims Administrator, who will weigh the evidence carefully and objectively, in accordance with the court's guidance. A certificate from a recognized laboratory or doctor stating the measured level of dioxin in the claimant and the method by which that level was estimated may be submitted to the Claims Administrator. Dr. Jeanne

Stellman and Dr. Steven Stellman will assist in identifying a benchmark "normal background level" to which the claimant's measured level will be compared. Credible measured levels significantly higher than the benchmark level will be presumptive evidence of exposure. A claimant relying on these tests must also submit evidence that the veteran was in Vietnam and could have come in contact with Agent Orange. Such evidence could include military records, letters sent home during the war which indicate the veteran's location or mention herbicide spraying, corroborative testimony of fellow veterans, and the like. In addition, any claimant, regardless of what information was initially presented to the Claims Administrator, may submit such test results to the Special Master for Appeals on appeal of a denial of payments by the Claims Administrator. The costs of any such testing must be borne by the claimant.

Finally, persuasive proof of direct exposures by persons who sprayed Agent Orange or loaded it or were otherwise in direct contact with it will be accepted. Proof by affidavit, or other persuasive forms of proof will suffice.

### 2. Length

The length of the payment program will remain as originally proposed, unless the court terminates it earlier because of lack of funds or extends it because of an excess of funds. It is now estimated to proceed as follows:

> The payment program will run for ten years, beginning January 1, 1985 and ending December 31, 1994. No payment will be made for death or disability occurring after December 31, 1994. Payment will be made for compensable deaths occurring both before and after January 1, 1985. Payments will be made for compensable disability to the extent that the period of disability falls within the ten years of the program's operation. In addition, initial claimants will receive a premium to account for each year the veteran was disabled in the past, up to a total of 15 years.

*In re "Agent Orange" Product Liability Litigation,* 611 F.Supp. 1396, 1417 (E.D.N.Y.1985). Because of the delay during appeals, payments will actually commence around the end of 1988, and will be calculated to compensate eligible claimants retroactively for disabilities and deaths existing or occurring between the original January 1, 1985 starting date and the date the Program begins operations. These retroactive payments may be allocated over several annual payments in order to smooth out the flow of monies from the fund.

Should future experience indicate the desirability of some change in these arrangements because of an excess or shortage of funds, the court retains the right to make modifications. Fluctuations in interest rates, as well as in the number and types of claims, will affect this decision. The Claims Administrator and the investment advisors will be in a position to provide continuous data to the court so as to permit informed modifications as needed. By the end of 1989 a reanalysis and a better understanding of the needs and resources of the fund will be possible.

### 3. Claims Administrator

Pursuant to the advice of Special Master Feinberg and the Payment Program Advisory Board, extensive requests for bids for Claims Administration services were prepared and distributed. Many entities responded. After completing a painstaking analysis of the resources, skills and fee proposals of the bidders, Special Master Feinberg and the Payment Program Advisory Board recommended the selection of Aetna Technical Services, Inc. and Aetna Life Insurance Company (hereinafter, the Claims Administrator or Aetna) to provide claims administration services. *See* Letters from Special Master Kenneth Feinberg to the court, dated July 16, 1986 and August 28, 1986, describing the selection process. This bid process was much like the bid process described in part V–E, *infra,* for an accountant. The Special Master and the Advisory Board negotiated a proposed Claims Administration Agreement with Aetna, which the court has now approved. Absent objection, it will be signed by the court on July 8, 1988. During the interim period while appeals were pending, Aetna entered into a consulting agreement under

which it agreed to provide preliminary services necessary to prepare for implementation of the Payment Program.

The Claims Administrator will handle all claims submitted for compensation from the Payment Program. The preparations for this task are described in part III–B–5, *infra*. In summary, the Claims Administrator will administer the entire claims procedure, recording claims on a computerized database, sending out questionnaires, receiving completed claims applications, answering questions about the applications, reviewing applications and awarding payments. All these activities will be governed by court order and by the Claims Administrator's contracts with the court. The eligibility criteria for Payment Program awards have been incorporated into the Claims Administrator's contract. Aetna will perform the ministerial task of collecting and reviewing claims to determine, subject to confirmation by the court, whether they meet the eligibility guidelines established by the court. Any modifications to or clarifications of the eligibility criteria will be made only by the court.

### 4. Special Master for Appeals

The court orders the appointment of W. Bernard Richland as Special Master for Appeals. Mr. Richland is a distinguished member of the bar who served as Corporation Counsel of the City of New York from 1975–77 and Assistant Corporation Counsel of the City of New York from 1943–58. He is now a Referee in Attorney Disciplinary Proceedings in New York State courts, a Commissioner of the New York City Charter Revision Commission, and an Adjunct Professor of Law at New York Law School. He has been in private and public practice, and has taught and written extensively. Special Master Richland will consider and resolve, subject to confirmation by the court, all appeals of claims decisions adverse to the claimant rendered by the settlement fund's Claims Administrator. All such appeals may be made in writing only. In the event that Special Master Richland's decision on a claim is unfavorable to the claimant, the claimant may appeal by written submissions to the court. No oral argument on the appeal to the Special Master

for Appeals or to the court will be permitted.

### 5. Other Implementation Actions

As noted above, the Special Masters and the Claims Administrator, Aetna, have worked under the terms of an Interim Consulting Agreement to establish all systems and facilities, and to prepare all forms and procedures, necessary to put the Payment Program into operation promptly once the appeals were concluded. The Claims Administrator's implementation activities, all of which required court approval, included:

* *Designing and creating forms.* The court, Special Master Feinberg and the Payment Program Advisory Board reviewed and commented on drafts of the "preliminary letter" to be sent to all claimants when the Payment Program commences operations and the Application for Payment Kit to be sent to all claimants responding to the "preliminary letter." The Application Kit consists of forms for applying for disability and death benefits, a form for showing the veteran's location and time of service in Vietnam, a physician's statement form, forms to assist the claimant in obtaining military records, and an instruction booklet. Aetna revised these forms in accordance with the directions of the court after its review of the initial drafts. Drafts of the Application for Payment Kit and the "preliminary letter" are attached as appendices to this memorandum.

* *Analyzing and inputting claimant data base.* The Claims Administrator has incorporated into its computer systems a computer tape containing all information collected and recorded by the Agent Orange Computer Center. This information constitutes all the claims made by veterans and their families. Aetna is continuing to work with the Agent Orange Computer Center in completing the data base and filling in missing items. The tape has been tested and prepared in a format compatible with Aetna's systems. Aetna has programmed its

computer systems to utilize this tape as a mailing list and as a database of claimant information. This database is for the use of the court in operating the Payment Program and is not open to the public or to any governmental agencies, nor may it be used by Aetna for any other purpose. The privacy of members of the class requires this limitation.

* *Modifying computer systems and creating work plans.* The Claims Administrator has developed the computer programs and modified its systems to accommodate the Payment Program. In addition, Aetna has prepared workflow plans that will guide the claims administration operation.

* *Developing claimant information services.* Aetna will establish a toll-free telephone service to answer claimants' questions. The Special Master and the Payment Program Advisory Board worked with Aetna in developing the material and information to be used by the operators who will be handling calls received on toll-free telephone lines. Aetna has prepared a comprehensive reference manual containing detailed questions and answers for those who will handle calls from claimants. This manual will help ensure that claimants receive reliable, accurate and consistent information when calling the toll-free line.

* *Integration of exposure system.* The Special Master and Aetna have worked with the Exposure Consultants to integrate the computerized exposure analysis program into Aetna's computerized claims review systems.

In addition to the activities described above, the Special Master has worked to complete other tasks critical to the success of the Payment Program.

* *Offsets.* Legislation proposed in Congress and a number of states would exempt payments from the Settlement Fund from the definition of income for purposes of eligibility for Veterans Administration pensions and other social welfare benefits.

The Special Master and the Payment Program Advisory Board have, at the request of congressional staff, responded to inquiries and prepared testimony and other materials regarding this proposed legislation. *Neither they nor anyone else is authorized to "lobby" for or against such* proposed legislation at the federal or state level as representatives of the court.

The court, nevertheless, continues to be concerned that the Veterans Administration and Social Security and welfare agencies might reduce benefits to veterans and their families as a result of payments that the veterans or their families receive from the Agent Orange settlement. Courts have generally taken the position that such benefits should not be reduced when a tort recovery is obtained because tort compensation is not income but rather restoration of a previous loss. *See In re "Agent Orange" Product Liability Litigation,* 611 F.Supp. 1396, 1423–27 (E.D.N.Y.1985). It is important that those most in need not lose their precious social security income, pensions, medicaid, food stamps, or other benefits as a result of compensation received in settlement payments for torts committed against them. Off-setting reductions in other benefits would reap only marginal budgetary savings and would defeat the purpose of this judicial restorative remedy; those in need would be sorely deprived.

* *Taxes.* The tax consequences of the settlement fund payments are also being considered. To the extent that payments from the Agent Orange Fund can be appropriately structured, any tax effect on the recipients of assistance should be eliminated. The Special Master has continued to work to obtain a ruling from the Internal Revenue Service that monies distributed from the Payment Program will not be deemed taxable income to the claimant. The Special Master has prepared materials for review by the IRS and has met with appropriate representatives of the IRS to explore the issue.

* *Communications with the class and others.* Special Master Feinberg is continuing to respond to inquiries and requests

for information received from claimants, veterans organizations, the media, Members of Congress and others. In addition, the Special Master provides periodic updates of the status of the Settlement and of implementation activities to the major veterans service organizations and to interested publications. The court has issued a press release summarizing the major features of this opinion, and the Special Master's staff members are serving as contacts for the media. These activities are essential to alert members of the class to their rights.

## IV. CLASS ASSISTANCE PROGRAM

### A. *Original Foundation Concept*

This court's original distribution plan ordered the creation of a Foundation to administer $45 million and to allocate those funds to class assistance programs as the Board of Directors of the Foundation determined. The idea of "class assistance" was that, in addition to the direct awards made to claimants under the Payment Program, part of the settlement fund should be devoted to service projects that would benefit all members of the class. Such projects would maximize the value of the settlement fund by providing useful services to large numbers of exposed veterans and their families, rather than adding small dollar amounts to those claimants found eligible for cash compensation awards.

In the original Foundation concept, the court retained "continuing control over the assets and disposition of the settlement fund," *In re "Agent Orange" Product Liability Litigation,* 611 F.Supp. 1396, 1435–36 (E.D.N.Y.1985), and kept "jurisdiction over the foundation and its endowment and ... the power to intervene," *id.* at 1436. But the court expressly intended to exercise a "comparatively modest supervisory role in the operation of the class assistance foundation." Several options for Foundation expenditures were discussed, but, beyond requiring that the expenditures be directed to benefit members of the class, *id.* at 1433–34, the court granted the Board of Directors the power "to make all procedural and substantive decisions necessary to run the foundation, including investment of the endowment, establishment of fund-

ing priorities and the actual awarding of grants." *Id.* at 1436. The Board of Directors was to be appointed by the court, almost wholly from among Vietnam veterans, and would then be "self-governing and self-perpetuating." *Id.* at 1434–45.

The court of appeals found this arrangement unsatisfactory. It thought that the Foundation Board's decisions might be at odds with the interests of some members of the class, that the unspecified nature of the Foundation's programs might raise and then frustrate class members' expectations, that the Foundation might expend settlement funds on "activities inconsistent with the judicial function [such as] political advocacy," and that the court would be required to intervene repeatedly in Foundation decisions. *In re "Agent Orange" Product Liability Litigation,* 818 F.2d 179, 185–86 (2d Cir.1987). The court of appeals therefore insisted that this court exercise "direct judicial supervision" of expenditures, *id.* at 186, and "designate and supervise, perhaps through a special master, the specific programs that will consume the settlement proceeds," *id.* at 185.

The court of appeals did not reject the essential concept of class assistance. It approved utilization by the district court, after consultation with veterans' groups, of portions of the fund for class assistance programs. *Id.,* 818 F.2d at 186.

### B. *Post–Appeal Modifications*

#### 1. Veterans Advisory Board, Advisor, Executive Director and Staff

In lieu of the Foundation, previously described, the court establishes a Class Assistance Program. Pursuant to the court of appeals' decision, the Class Assistance Program will operate under the court's supervision to distribute services to class members. The Class Assistance Program will be administered by the court with the advice of the veterans Class Assistance Advisory Board, an Executive Director and staff, and such other consultants and advisors as the court may designate. No direct services will be rendered by the court or its staff, whose function will be to allocate money to those who will provide the servic-

es, and to ensure the accountability of service providers.

Pursuant to the direction of the court, Special Master Feinberg entered into an agreement with Ira S. Hirschfield to act as an advisor on the development of the Class Assistance Program. Dr. Hirshfield is a nationally known expert on philanthropy. He is about to take office as the Director of Philanthropy, Rockefeller Family and Associates. He was Executive Vice President of the Levi Strauss Foundation from 1981 to 1985 and Executive Director of the Evelyn & Walter Haas, Jr. Fund from 1985 until the present. Since 1985 he has also been a Policy Scholar at the Institute for Health Policy Studies at the University of California at San Francisco, and since 1986 he has been a Senior Fellow of the Council on Foundations. He is a member of numberous national and regional foundation boards and the author of many scholarly articles on philanthropy.

Dr. Hirschfield has provided consulting services in connection with the development, establishment and implementation of the Assistance Program. These consulting services have included developing Requests for Proposals for various services, researching and developing program ideas, establishing contacts in the nonprofit, philanthropic, corporate and public sectors, working with the veteran advisors selected by the court, and directly advising the court and the Special Master.

The Class Assistance Advisory Board has already been described. It will serve without fee, except that the expenses of its members in connection with this work will be reimbursed.

An advertisement is being placed in appropriate publications seeking an Executive Director for the Class Assistance Program, to be appointed by the court. If possible, the Executive Director should have seen service in Vietnam during hostilities. As soon as the Executive Director is chosen by the court, the Executive Director will gather a very small staff. The Director and his or her staff will serve as employees of the court or other entity established by the court, and their successors will be appointed by the court when vacancies occur. The

Director's responsibilities will include solicitation of proposals for the use of funds, investigation of these requests, and, after meeting with the Class Assistance Advisory Board, working with the court to approve appropriate requests and disburse necessary funds.

Pursuant to the court of appeals' instruction, the court will retain direct accountability authority over every project funded by the Class Assistance Program. Grants will be made only on court order. The court will determine the specific programs that will consume the settlement proceeds, after consultation with the Class Assistance Advisory Board, the Executive Director, and the Special Master. Funds not yet allocated to specific programs will be retained in reserve for future expenditures on new or existing programs or for reallocation to the Payment Program, in the court's discretion. As described in part V *infra,* all investment decisions for the entire settlement fund, including those funds allocated to the Class Assistance Program, will be made under the authority of the court with the advice of the Investment Managers.

2. *Alternatives Under Consideration for Provision of Class Assistance*

The new $52 million Class Assistance Program will consider a variety of projects, including services to benefit the children and families of Vietnam veterans. The choice among and funding of these projects will be determined by the court, in consultation with the Executive Director, the Special Master, and the veterans Class Assistance Advisory Board. This section describes several options now under consideration; the court may ultimately decide to fund all, some, or none of them, or to fund them in modified form. The discussion presented here is provided only to illuminate the process creating the Class Assistance Program.

Numerous strategies for assisting the class have been suggested and investigated. Among them are an information-referral network; aid to the children of exposed veterans, particularly to those children suffering from birth defects; aid to homeless veterans; genetic counseling; legal aid; so-

cial work and counseling; employment assistance; substance abuse treatment; post-traumatic stress disorder (PTSD) treatment; and diverse local community assistance grants. It has also been suggested that part or all of the Assistance monies be held in reserve for various deferred benefits. Care must, of course, be taken to ensure that there is no duplication of available private and public services and that Agent Orange funds are not used for activities which are or should be otherwise funded. This section explains the court's thinking on several of these suggestions.

### a. *Information and Referral Network*

One alternative is financing an information and referral service or "hotline" for class members to obtain information about the Agent Orange litigation and settlement and about benefits to which they are entitled, medical and legal assistance, placements in appropriate public and private programs, and counseling. Throughout this litigation, it has been apparent that many class members do not have access to accurate and reliable information about issues of concern to Vietnam veterans. In addition, many veterans have failed to take advantage of government benefits and social service programs available to them. The information and referral network is designed to address these information needs.

The Special Master and his staff have taken important steps to research and design such a service. After consulting with Vietnam veterans organizations and other experts, the Special Master has proposed that the network be prepared initially to respond to inquiries in five main areas:

* the Agent Orange litigation, settlement and distribution plan. Some of this information will also be available from the Claims Administrator's toll-free lines, but the information network will provide much more comprehensive descriptions and will, in any event, need to be prepared to address this subject to any veteran who seeks other information as well.

* research activities regarding the possible effects of exposure to Agent Orange.

* genetics and referral to genetic counseling centers when appropriate.

* birth defects and other disabling conditions that children of class members may experience, and referral to local organizations that can provide services to children with special needs and to the families of those children.

* rights and benefits to which class members may be entitled and referral to local veterans organizations, state or county veterans affairs officers or legal aid clinics that can provide assistance in obtaining those rights and benefits.

As the network program develops and progresses, and as the needs of the class become better known, the information and referrals will be prepared to respond with new information and new referral sources.

The network would operate through toll-free telephone lines, providing information to class member callers from throughout the nation. Staff of the network will include trained operators equipped with detailed and comprehensive informational materials. Where appropriate, the network would refer callers to other organizations. The network will publish easily understandable, comprehensive pamphlets of up-to-date information for veterans, available free of charge. The organization would be centralized for internal coordination, but caseworkers would be able to provide advice about local services available to each veteran.

The network is designed to provide non-clinical and non-diagnostic services. After determining the caller's situation and request, network operators will use prepared informational materials to answer questions, and a computerized database to identify the appropriate community-based organizations, service providers, legal aid offices and other facilities available to assist the caller in the caller's vicinity. The information and referrals will be communicated orally, and, where appropriate, by mail. Prepared pamphlets on selected areas of concern will also be made available to callers. In particular, a pamphlet of general information will be sent to the caller, with

instructions to assist the caller in working more effectively with service providers.

Special Master Feinberg has investigated the possibility of funding and establishing such a network service. He has conferred with several organizations that develop and operate large national hotlines. In addition, he has visited two such programs to observe their operations. He has prepared a draft Request for Proposals to organizations capable of administering an information and referral network for the Agent Orange class, and has identified organizations that can assist with the development of the written materials and referral source database. The network should begin operating as soon as practicable, following the court's approval of these plans, the selection of contractor organizations, the preparation of written materials and databases, and the training of operators.

b. *Family– and Child–Related Needs*

A related alternative could connect veterans whose children have birth defects with available services for those children, possibly through the information and referral service just described. A different option is to use funds to pay for surgery and rehabilitation for a limited group of children of class members who suffer from reparable birth defects. Although this option would produce some immediate and happy results for a relatively few children, it has the unfortunate feature of leaving those with irreparable birth defects without aid. This option might therefore be combined with an analogous scheme for irreparable birth defects.

More detailed information about core program areas are being developed. The Special Master has begun the process by contacting numerous organizations working in all aspects of birth defects and developmental disabilities.

Each state has its own agency charged with providing services, medical and otherwise, to children who are born with or who develop handicaps. The Special Master has contacted over twenty of these state agencies in all regions of the country. In addition to the collection of information through interviews with responsible officials, written information on a number of particularly interesting programs has been requested.

The federal government, primarily through the Department of Health and Human Services, operates and funds a number of important programs for children with birth defects. The Special Master is working with appropriate federal agencies to obtain information about these programs. He has also had extensive conversations with over twenty private organizations involved in work on birth defects. These groups cover a broad spectrum of activities including parent support and other "self-help" networks, assistance for children with specific diseases, local and national lobbying efforts, research, hotlines and information clearinghouses.

Preliminary research shows that the services available to an infant or child with a birth defect or developmental disability depend to a large extent upon where the child's family resides. States have considerable discretion in the use of federal funds allocated for services for children with birth defects or developmental disabilities. The amount of additional funding provided by the state itself also varies greatly. Local priorities direct available monies toward specific conditions and services; other types of programs may go completely unfunded. As a result, a child born in State X with a congenital hearing defect might have a wide array of services available to him or her, while a child with the identical condition in State Y might have a far more difficult time gaining access to the funding and programs necessary to deal with the condition.

Despite these geographic discrepancies, preliminary research shows that the following obstacles appear to confront families of class members across the nation. The list is only preliminary at this point, but it does give a flavor of the problems that may exist:

(1) Birth defects organizations do not engage in much outreach that is specifically directed toward Vietnam veterans and their families. Building a linkage between these organizations

and the veteran population may be useful.

(2) There is often no central source of information about available services and financial aid. Thus, families have difficulty locating and obtaining assistance. They may be forced to go "door-to-door" to a variety of federal, state and private agencies in search of funding. A centralized and comprehensive information service could help alleviate this problem.

(3) Obtaining adequate health insurance for children born with birth defects is often difficult and prohibitively expensive.

(4) There is little funding available for "respite services" such as trained babysitters to help ease the burden on families who choose to care for their children at home.

(5) Many states have yet to organize registries that include all children born with birth defects. Those registries that do exist are often inadequate. Accurate registries would be useful for data collection and for assisting in matching children with social service providers.

(6) Few states provide funding or facilities for procedures that are described as "experimental" or "extraordinary," such as transplant operations.

It is important to note that the Special Master's search in this area is only in its initial stage. He has scheduled a series of meetings with leading organizations and he is awaiting information from numerous agencies and organizations. He is prepared to issue requests for concept papers and requests for proposals to organizations capable of providing services to the children of class members and their families.

### c. *Homeless and Disadvantaged Veterans*

The large number of homeless Vietnam veterans, many of whom suffer emotional traumas or mental illnesses, warrants serious consideration of assistance in obtaining benefits that are already available, but unused. *See, e.g., Nation's Homeless Veterans Battle a New Foe: Defeatism,* N.Y. Times, Dec. 30, 1987, p. 1, col. 1. In addi-

tion to a telephone hotline, such homeless veterans could be assisted by outreach programs employing social workers and other trained persons (preferably themselves veterans) to connect the needy with services, or by financial aid to existing service providers who assist the homeless. The court and the Special Master are investigating such services.

Many members of the class have expressed interest in assistance for veterans with addictive, mental or emotional disorders, especially post-traumatic stress disorder and substance abuse. An additional area of interest is the provision of employment assistance, job referral information, transitional housing, and similar benefits to disadvantaged class members.

The Special Master is investigating service providers with the ability to provide these kinds of services for veterans, and has prepared draft requests for proposals targeting these areas.

### d. *Genetic Counseling*

The court already has before it proposals for genetic counseling. The information and referral service could refer interested callers to local counseling programs. In addition, the Class Assistance Program could make grants to local service providers to assist them. The Special Master has prepared a draft Request for Proposal for this kind of project.

### e. *Assistance with Rights and Benefits*

A program could be developed to assist class members in their attempts to secure benefits or services from agencies such as the Veterans Administration. An appropriate program of this nature might be developed by existing veterans organizations with or without the cooperation of legal aid or law school clinical programs. Veterans face numerous obstacles in their efforts to secure benefits, among them inadequate knowledge of what is available and inability to utilize complex procedures. Vietnam veterans are also often dislocated from mainstream society.

This assistance would be limited to advice and representation in individuals' requests for benefits or services, and would not be available for lobbying activities, in

order to avoid what the court of Appeals has termed "activities inconsistent with the judicial function [such as] political advocacy." *In re "Agent Orange" Product Liability Litigation*, 818 F.2d 179, 186 (2d Cir.1987).

The court may pursue a variety of avenues for assisting class members with their rights and benefits. The information and referral network would provide some help. In addition, the Class Assistance Program could work with veterans organizations to produce a manual of rights and benefits information. A benefits assistance information clearinghouse could be established to collect and disseminate information and advice and to address particularly complex benefits questions. A program of outreach —employing social workers or other experts—could be developed to assist veterans, especially those with problems of literacy and homelessness. The Special Master has investigated all of these ideas and is prepared to issue requests for proposals.

### f. *Reserve*

Another alternative is to hold the funds earmarked for the Class Assistance Program in reserve. This would permit the court, in later years, to modify the Payment Program to authorize payments to class members affected by a particular disease or disability should evidence of a causal link to exposure to Agent Orange become available. The court takes judicial notice under Federal Rule of Evidence 201 of the research and numerous studies now being conducted by, *inter alia*, the Centers for Disease Control, the New Jersey and the Massachusetts Agent Orange Commissions, and other groups. For example, one recent study found that Marines who had served in Vietnam were more likely to be afflicted with certain lung cancers and non-Hodgkins lymphomas than were Vietnam-era Marines who served elsewhere. *See Cancer Deaths High for Some Veterans*, N.Y. Times, Sept. 4, 1987. The same study could find no such disparity between members of the Army who served in and out of Vietnam, so its persuasive force is questionable.

As described *supra*, $10 million of the $52 million Class Assistance Program will initially be held in reserve for several years.

Ultimately, the court will distribute those funds in its discretion to benefit the class. Holding additional funds in reserve is not appropriate. Should scientific developments show a connection between Agent Orange and diseases of veterans or their children, it will be the government's responsibility to provide assistance and compensation; in other contexts Congress has shown its willingness to accept that burden on behalf of the nation.

### g. *Tentative Conclusions About the Direction of the Class Assistance Program*

One important goal of the Class Assistance Program is that the court maximize the resources available for service expenditures by operating projects through existing provider organizations rather than by creating a new organization. This practical suggestion could be applied to many of the substantive options already described. It is important that the court not itself become involved in the details of operations. Its function should be to select projects, advance money, and exercise the oversight to ensure that the money is being spent as planned. In addition, making grants to existing service providers can help strengthen worthy projects already in place, and can prime the pump for programs that will persist and prove useful after the Agent Orange Settlement Fund is exhausted.

To multiply the impact of the Class Assistance Program, the court is seeking "partnerships" with existing service providers and foundations. By offering a grant, or matching funds, to an existing and successful service provider, the court may be able to direct substantial social assistance to veterans that might otherwise be unfocused on their needs.

A third goal is to make some immediate grants to capable, worthy service providers in local communities. The court hopes that the Class Assistance Program can have some direct, immediate impact on needy individuals. In addition, these early grants can serve as demonstration models for future Class Assistance Program grants.

After these early grants, funding in the topical areas described above will be pur-

sued through requests for proposals. In almost every area described, the Special Master is already prepared to issue such requests for proposals, after having consulted with the Class Assistance Advisory Board and the court.

### 3. Data Required

Unfortunately, there is no central source of geographic or demographic data on veterans who served in Vietnam. The Veterans Administration has statistical information available on the current location of Vietnam-era veterans, but no geographic breakdown of veterans who actually served in-country, *i.e.*, veterans who may be class members.

Obtaining information from the Veterans Administration was complicated by the fact that each request for data must be processed through the Department of Justice. During this litigation the Department of Justice has taken the position that direct assistance from government organizations to the Special Master and to the court will not be permitted. Nevertheless, the Special Master is continuing to work with the Department of Justice in an attempt to obtain any statistical or other information available from the Veterans Administration. With the end of the government's role as a defendant in the action, it is hoped that the Department of Justice and other government agencies will play a more forthcoming and cooperative role.

In the absence of a centralized data bank or ready access to the Veterans Administration, Special Master Feinberg has worked with a variety of sources to develop the necessary geographic and demographic information. He contacted the state veterans agency in each of the fifty states, the District of Columbia and Puerto Rico. In addition, he and his staff spoke with a number of public health departments and veterans service organizations in the several states. He requested statistics as to the number of Vietnam veterans who reside in the state and how many of those veterans are women, members of minority groups, disabled, incarcerated, or have children with birth defects. He also requested any other relevant data that may be available. By and large, the state agencies and veterans organizations have been cooperative and helpful, in part because they have not been inhibited by the restraints placed upon federal agencies by the Department of Justice. The Special Master has compiled a document summarizing the available demographic information on Vietnam veterans.

### 4. Avoiding Duplicative Programs

In order to avoid unnecessary duplication of existing services, the Special Master has identified services currently offered to veterans, both on a broad scale and in specific program areas. Accordingly, he has canvassed veterans service organizations and other institutions to compile general information about the types of services that are currently available to Vietnam veterans and their families. The Special Master has interviewed representatives of the major veterans organizations in an effort to determine the services they currently offer and to whom those services are provided. Information has been compiled on the services available through government programs and private voluntary service organizations and other non-profit agencies. In the course of these conversations, the Special Master has discussed the organizations' plans to offer services in the future and explored the ways in which the Class Assistance Program and the veterans service organizations might work together.

## V. MONEY MANAGEMENT AND ACCOUNTING

It is essential to provide a method of controlling the considerable funds in the court registry which will be paid out over some years. The total sums will be well over a quarter of a billion dollars.

### A. *Present Method*

Up to now the management and disbursement problem has been simply handled, without cost to the fund. The Office of the Clerk of the Court for the Eastern District of New York is responsible for all monies deposited pursuant to court order in pending litigation. While appeals and petitions for certiorari were pending, the court was obligated to maximize both safety and liquidity, and therefore the court directed that the Agent Orange settlement fund mo-

nies be invested in short-term United States Treasury Bills, except that, as necessary for periodic expenditures to administer the settlement fund, small short-term amounts are removed from the Treasury Bills and placed in a money market account. Monies in the money market account in excess of the $100,000 insurance coverage provided by the Federal Deposit Insurance Corporation held outside of official U.S. Treasury checking accounts are subject to "collateralization"—that is to say, the bank must guarantee the funds by providing government bonds for the full face value as collateral. Each month the Clerk's Office must file a financial statement with the Administrative Office of the United States Courts indicating each court account held, the amount of the account, the amount insured, the balance subject to collateralization and the amount of collateral pledged.

The Administrative Office strongly recommends that the courts use only federally insured financial institutions, and accordingly the Agent Orange money market account has been opened at one such institution. Procedures for obtaining collateral for registry funds are printed in the *Guide to Judiciary Policies and Procedures* (rev. Oct. 31, 1986). Treasury Department regulations appear at 31 CFR § 202. *See id.,* § 202.6 (collateral security).

The Clerk's Office currently requires slightly more than $2,000,000 in collateral for all non-Agent Orange short-term accounts. A total of $4,000,000 of collateral has been pledged, providing a cushion of approximately $2,000,000 to cover any Agent Orange court orders that may increase the need for pledged collateral. This cushion has been used to date to protect any cash needed to cover checks for administration of the Agent Orange Funds. It will obviously not be enough to cover the tens of millions of dollars in disbursements required under the various programs described above.

### B. *Challenges Confronting Financial Management During Distribution*

Up to this point, management of the settlement fund has been straightforward. Few disbursements have been made. Ex-cept for some relatively small money market funds to meet administrative expenses, all the funds have been invested in a single form of government security.

Under the terms of this order, this arrangement must change. Large disbursements must be made to the Payment Program, the Class Assistance Program, and for attorneys' fees, and the Australian and New Zealand trusts. The monies must be invested in a portfolio that both protects the fund against losses and that obtains an acceptable return for the fund. The court must retain control over the investments, but cannot be burdened by day-to-day administrative duties. This combination of financial requirements presents a challenging problem.

Certain large disbursements must be made almost immediately: approximately $13 million in attorneys' fees, $5 million to the Australian and New Zealand trusts, and significant sums to set in motion the Payment and Class Assistance Programs. During the next twelve months well over $100 million should be disbursed. For this reason, a large portion of the settlement fund must be kept in a form sufficiently liquid to provide for short-term disbursements.

The remainder of the fund must be available for gradual disbursement over the next several years. These funds must be secure against excessive risk and must not be vulnerable to uninsured losses. Meanwhile, the time value of these monies must not be lost. They must be invested in uses that provide as significant a return as is consonant with safety.

All of these funds must be held and remain under the control of the court until they are actually disbursed to recipients so that any interest earned accrues to the benefit of the class. This applies even to overnight interest while disbursements are being made.

### C. *Selection of Contractors to Provide Financial Services*

In order to tackle these knotty financial problems, the court consulted with the Payment Program Advisory Board, Special

Master Feinberg, and Special Master for Investment Policy, Richard Davis. They, in turn, consulted various financial specialists. This group designed a complex series of agreements to ensure that all of the settlement fund is adequately protected and earns the maximum interest consistent with safety. As described in part V–D *infra,* the assets will be held by the court but deposited by the court into a private depositary. They will be invested by the court, after receiving the advice of two investment managers, in United States government securities notes and in certain other short-term "paper."

Requests for bids were made nationwide for three tasks: two investment managers to advise the court on investment choices, and an accountant to oversee the operations. In addition, a depositary was needed to hold custody of the funds and to act as disbursing agent. After reviewing all bids and interviewing finalists, the Special Master and the Payment Program Advisory Board recommended the selection of and negotiated contracts with the following entities:

1. An Investment Managment Agreement with Brown Brothers Harriman & Company to advise on investments.
2. An Investment Management Agreement with Irving Trust Company to advise on investments.
3. A Depositary Agreement with Irving Trust Company to act as custodian.
4. An Accounting Consultant Agreement with Price Waterhouse to provide all necessary auditing and accounting services.

The procedure for awarding these contracts was roughly the same in each case. A Request for Proposals was issued by Special Master Feinberg's office, and responses were reviewed by the Special Master's staff and members of the Payment Program Veterans Advisory Board. Finalists were selected and interviewed in person, and a final recommendation was made to the court. The court considered each proposed contract and required modifications. *See* Letter and Enclosures from Special Master Kenneth Feinberg to the Court, December 8, 1987 (submitting proposed contracts); Letter from Special Master Kenneth Feinberg to the Court, August 28, 1986, and Letter from Special Master Kenneth Feinberg to the Court, July 16, 1986 (progress reports and recommendations on contracts).

The last of the four awards listed above, covering accounting, is probably the easiest to describe in detail, and the method used for awarding it was typical of all four agreements. The procedure followed in awarding the accounting contract is set out below.

Special Masters Feinberg and Davis and the five-member Agent Orange Payment Program Advisory Board concluded, based on the design for the new distribution plan embodied in this order, that it was necessary to secure an accountant to provide certain accounting and consulting services for the Agent Orange Settlement Fund. The Advisory Board delegated to two of its members, John McElrath and Al Dandridge, the authority to act on behalf of the Board to recommend an accountant and to negotiate a contract with the accountant. Accordingly, the Special Masters, along with the two Advisory Board members, conducted a competitive bid process for the purpose of hiring an accountant.

The Special Masters, with the assistance of the two Board members, developed a Request for Proposal for Consulting and Accounting Services for the Agent Orange Fund. On July 29, 1987, this request for proposal was approved by the court and distributed to eleven accounting firms, including all firms that had previously expressed an interest in serving the Fund. Nine of these firms submitted proposals.

A proposal evaluation team, made up of Special Master Davis, the two members of the Advisory Board and two members of Special Master Feinberg's staff, reviewed and evaluated each proposal. The proposals were evaluated based on each firm's:

(1) previous experience in auditing insurance company claims payment operations;
(2) experience in reviewing long-term disability insurance programs;

(3) experience in reviewing investment services and in auditing investment activity;

(4) understanding of the unique needs and circumstances of the fund; and

(5) proposed rates and willingness to offer discounts for the fund.

After several meetings and conferences, the review team selected three companies as "finalists." Each of the three finalists was highly qualified to perform the required services.

The evaluation team interviewed each finalist. After numerous discussions, the evaluation team determined that Price Waterhouse would best serve the needs of the fund. Both in the proposal and in the interviews, Price Waterhouse demonstrated a thorough understanding of the needs of the Fund and an ability to provide the range and quality of services requested. Accordingly, Special Master Feinberg negotiated a consulting agreement between Price Waterhouse and the Agent Orange Fund outlining the terms under which the services are to be provided. This consulting agreement was approved by the evaluation team and ordered entered into by the court. This and other agreements are on file in the court and in Special Master Feinberg's office.

Price Waterhouse will audit the Agent Orange Settlement Fund on an annual basis and prepare a written report to the court. Generally accepted accounting and auditing standards will be applied. A copy of each annual audit report will be forwarded to the Office of Audit and Review of the Administrative Office of the United States Courts. Price Waterhouse's tasks and activities are described more fully in part V-E, *infra*.

D. *Investment and Depositary Arrangements*

The contracts negotiated with Irving Trust, Brown Brothers Harriman, and Aetna have created a system for holding, investing and disbursing the funds that meets the challenges described above. The system protects the fund from excessive risks while permitting a smooth disbursement flow and retaining as much interest as possible for the fund itself. This somewhat elaborate system was designed by the Payment Program Advisory Board and the Special Masters, Kenneth Feinberg and Richard Davis, and was approved by the court after meeting with representatives of the banks and of Aetna. The intricacy of the system reflects their meticulous analysis of the variety of criteria and options. The court is very grateful to the Board and the Special Masters for their diligence and intelligence in designing this network of financial functions.

Irving Trust will act as depositary. Irving will hold custody of the funds for the court, in the name of the Agent Orange Fund. The funds will continue to be identified as belonging to the Fund, segregated and not intermingled, and not the property of Irving. Irving will have no property interest in the Fund itself. The court will retain control over the funds while avoiding the day-to-day management of minor matters. Irving will be responsible for disbursing funds at the court's direction.

While the funds remain undisbursed, they will be invested in United States Government securities (such as Treasury Bills) at the court's direction. The court will be advised in these matters by the two investment advisors, Irving and Brown Brothers Harriman. The Advisory Board was of the firm opinion that two investment advisors were preferable to one. There will be no duplication of payment for this advice—fees will be charged by each advisor only for the fund on which that advisor is advising. Fees are competitive with amounts being charged in the market for such services. For investment purposes, the monies will be divided into three groups: approximately $100 million, slated for near-term disbursement (as described above), will be managed by Irving so as to be available for payment over a one-year period. Approximately $50 million will be managed by Irving so as to be available over the longer term, and the remaining $60 million will be managed by Brown Brothers Harriman in longer-term investments. The remainder of the funds, which are allocated principally to the Australian and New Zealand trusts and for attorneys

fees, will be disbursed in the very short term. In this manner, funds will be available as needed and investment decisions will be somewhat diversified.

All investments will be made pursuant to investment plans adopted by the court, and the court will have the final word on all investment decisions. As noted earlier, the depositary will disburse funds pursuant to court order only.

Disbursement will operate primarily through two channels, the Payment Program and the Class Assistance Program. Funds spent through the Payment Program will be routed to claimants in the following manner: Aetna, the Claims Administrator, will process claims and determine which claimants are eligible and the amount of the payment due, subject to court confirmation, according to the terms of the Program. As Aetna then awards payments, it will notify Irving, the depositary, of the required disbursement ten days in advance. Irving will call for funds from the investment managers, who will have known the approximate payment schedule in advance and who will therefore have arranged sufficient liquid assets. In general, Aetna will pay claimants by issuing drafts on the Connecticut National Bank; these drafts are not checks but are simply chits or stubs representing a right to receive payment. Claimants will deposit their drafts in their own banks, which will in turn demand payment from Connecticut National Bank. Connecticut National Bank will then pay the drafts and make same-day calls on Irving's funds. Irving will honor the calls and disburse monies from the settlement fund by same-day wire transfer. In this manner, the settlement fund will continue earning interest at the depositary until the last moment before disbursement; the funds will not be deposited with Connecticut National Bank for any length of time. This mechanism safeguards the funds at the depositary institution and ensures maximum earnings for the class.

Disbursement through the Class Assistance Fund will be simpler. When the court approves an expenditure on a particular project, it will call for funds from the depositary, Irving. Irving will then disburse funds to the project contractors or other appropriate recipients. The court will have ample lead time to alert Irving of the need for funds and the Investment Managers will be able to arrange sufficiently liquid investments. Interest will continue to be earned by the fund until actual transfer of funds by Irving.

The settlement fund was kept in the care of the Clerk of the Court until the final denials of certiorari by the Supreme Court made disbursement imminent. Among other advantages, this policy minimized the management fee charged by the depositary for holding the fund.

Neither the court, the Special Masters, nor any contractor or advisor has title to the Agent Orange Fund for the purpose of protecting or conserving it for beneficiaries under the ordinary rules applied in chancery or probate courts, nor may any of them exercise the discretion of a trustee or fiduciary. Instead, the court shall supervise and direct the Special Masters to exercise powers enumerated in Rule 53 of the Federal Rules of Civil Procedure, with the assistance of the contractors and advisors, to administer the fund and to take necessary ministerial steps to effectuate the settlement and this distribution order.

### E. Accounting Services

The accountant consulting agreement provides for the following services, some of which were performed during the interim period while appeals were pending:

1. Review of Aetna's proposed pricing or billing rate structure to be incorporated into the Claims Administration Agreement. The accountant has completed a review and analysis of the pricing system that will be used for the Claims Administrator's services. In completing the review, Price Waterhouse met with the appropriate Aetna personnel and reviewed underlying data in order to obtain an understanding of the basis of Aetna's calculation of the billing rates proposed for the years 1988–89. Specifically, Price Waterhouse:

i) Compared Aetna's proposed billing rates to those set forth in the original proposal dated March 7, 1986.

ii) Quantified Aetna's current best estimate of the charges, including recurring cost charges, which will be incurred in the set-up and initial period and in the subsequent year and compared such amounts with Aetna's estimate of the aggregate charges.

iii) Ascertained the basis of the salary component of the total proposed billing rate.

iv) Ascertained the basis of calculation of the overhead components of the total proposed billing rate.

v) Discussed with the Special Master any significant or unusual matters relating to Aetna's proposed billing rates. Among the issues addressed were proposals to charge rent as a separate cost and categories of costs included in overhead.

2. Review of financial reporting procedures specified in the proposed contracts with Aetna, Irving Trust and Brown Brothers Harriman. Each of the current contracts with Aetna, Irving Trust and Brown Brothers Harriman has been reviewed in order to determine whether there are any financial reporting related provisions which the court should be aware of. Specifically, Price Waterhouse has:

i) Reviewed the applicable sections in each of the contracts relating to the provision of accounting data in order to determine whether the data are likely to be sufficient and appropriate to enable a contractor to prepare complete and accurate financial statements for the Fund.

ii) Reviewed the banking arrangements and advised the court that these were appropriate in the circumstances.

3. Preparation of standard financial statements for the Agent Orange Fund. To assist the claims and investment contractors in preparing reports for the court, Price Waterhouse will prepare pro-forma financial statements of the Fund which will show the anticipated income, expense, asset and liability financial statement captions.

4. Financial and performance audits. Price Waterhouse will conduct annual financial audits of each of the programs distributing settlement fund monies. In addition, Price Waterhouse may conduct performance audits of the programs at the request of the court.

5. Tax-related matters. Price Waterhouse will also provide certain limited consultation regarding tax issues relevant to the Agent Orange Fund, at the request of the court or the Special Masters.

Under the consulting agreement, Price Waterhouse will charge fees based on the standard hourly billing rate for each professional staff person. It has agreed to reduce its standard hourly rates by 10 percent for all services provided to the Agent Orange Fund and to discount its fees for recurring audit examinations by an additional 10 percent.

Similarly detailed contracts were concluded with the Investment Managers, the Depositary, and the Claims Administrator for the Payment Program. Documentation for these contracts is on file with the court.

F. *Further Details of Distribution Planning*

Further details of the current plans for distribution of the settlement fund will be found in this court's original distribution order, *In re "Agent Orange" Product Liability Litigation,* 611 F.Supp. 1396 (E.D.N.Y.1985), and supporting reports and communications on file in the court. All of these materials, including numerous reports of the Special Master, communications to and from the court, documents referred to in this opinion, and matters of which the court has taken judicial notice, are on file with the court. The Clerk will permit public access to these and all other materials on file.

As further documents are gathered from counsel pursuant to this court's orders requiring access to the public, they will be made available to the public. *See In re "Agent Orange" Product Liability Litigation,* 104 F.R.D. 559, 562 (E.D.N.Y.1985) (Magistrate's Pretrial Order No. 33, dated December 17, 1984) ("Protective Orders

Opinion"), *aff'd*, 821 F.2d 139 (2d Cir.1987), *cert. denied sub nom. Dow v. Ryan*, —— U.S. ——, 108 S.Ct. 344, 98 L.Ed.2d 370 (1987). These documents may be read or copied by the public. Space within one of the courthouses of the United States District Court for the Eastern District of New York, or another archive as ordered by the court, will be prepared for the creation of the necessary document depository. The Clerk of the Court will make adequate facilities available.

So ordered.

## VI. APPENDICES

A.  Letter to Claimants

B.  Application for Payments Kit

# THE AGENT ORANGE VETERAN PAYMENT PROGRAM

(In Spanish)

This letter contains important information
about the Agent Orange Veteran Payment
Program. If you would like a copy in Spanish,
please call [1-800-225-4712].

Dear _____:

The Agent Orange Product Liability Litigation was settled in May 1984 for the
sum of $180 million. With interest, that sum has now grown to over $230 million,
and more than a quarter of a million people have filed preliminary claim forms
seeking a payment from the settlement. The distribution of the settlement fund
has been delayed because the case was appealed to the Court of Appeals and
the United States Supreme Court. These appeals are now completed, and the
Court is ready to move ahead to distribute the settlement fund.

**The Court's plan for distributing the settlement fund** creates two programs.
The first program, the Agent Orange Veteran Payment Program ("Payment Pro-
gram") will distribute cash payments to certain disabled Vietnam veterans and to
survivors of certain deceased Vietnam veterans. The second program, [the
Agent Orange Assistance Fund], will use a portion of the settlement fund to
provide services to the class members — i.e., Vietnam veterans and their fami-
lies. This letter describes the key provisions of the Payment Program and ex-
plains what you must do to apply for a payment.

**To be eligible to receive money** from the Payment Program, you must be:

- a Vietnam veteran who is long-term totally disabled, or
- a surviving spouse or dependent child of a deceased
  Vietnam veteran.

In addition, to receive a payment, both veterans and survivors of veterans must
show that the veteran was exposed to Agent Orange using an exposure test
adopted by the Court and must show that the death or disability did not result
from an accidental, traumatic or self-inflicted injury.

The enclosed "Certificate of Enrollment" acknowledges that you are one of those
who filed a preliminary claim in 1984 or the years following, and that you are now
eligible to apply for a payment under THE AGENT ORANGE VETERAN PAY-
MENT PROGRAM.

To qualify for a payment, you will have to meet the eligibility standards of this program. That means **you must submit an Application for Payment form – even if you already have filed a preliminary claim form.**

To obtain an Application for Payment form, please **detach and mail the lower portion of your certificate.** When you return this form, the program administrator will send you an Application for Payment kit. This kit will include all the forms and instructions you need to file an application. Please – do NOT send any information, documents or records now.

The goal of the Payment Program is to distribute funds fairly and quickly to those class members with the greatest needs – namely those who are **totally disabled or the survivors of deceased veterans.**

**If you are not sure whether you should apply,** please do NOT request an Application for Payment kit at this time. **Call this toll-FREE number first–[1 (800) 225-4712].** You'll get fast, courteous advice from someone who knows all about the program.

Even if you decide not to apply now, keep your "Certificate of Enrollment" in a safe place. Then if your medical status changes at any time before December 31, 1994 and you want to apply, you may obtain an Application for Payment kit by simply detaching and mailing the lower part of your certificate.

The attached question and answer sheet explains the details of the Payment Program and repeats the toll-free telephone number you may call if you have additional questions.

Sincerely,

Robert C. Heinemann
Clerk, United States District Court
Eastern District of New York

as ordered by:

Jack B. Weinstein
United States District Judge
Eastern District of New York

*Answers to your questions about*

# THE AGENT ORANGE VETERAN PAYMENT PROGRAM

**Q.** Who may apply for payments under the Program?

**A.** The only people eligible for payments under The Agent Orange Veteran Payment Program are:

* **Vietnam veterans** who were exposed to Agent Orange while serving in Vietnam at any time between January 1, 1961 and December 31, 1971, and who became totally disabled before their 60th birthday.

* **Surviving spouses or dependent children of deceased Vietnam veterans** who were exposed to Agent Orange while serving in Vietnam during that same period, and who died before their 60th birthday.

**Note:** the Program will not make payments for disabilities or deaths caused by accidental, traumatic, or self-inflicted injuries.

If you are not a member of a group described above, please do not request an Application for Payment kit right now. Your cooperation will help keep the administrative costs of the program down, and help ensure that your fellow veterans or their families will receive their payments as quickly as possible. You may request an Application kit in the future if you become eligible during the life of the program.

**Q.** How will "total disability" be determined?

**A.** The Program will define "disability" as:

"The inability to work or engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death OR which has lasted or can be expected to last for a continuous period of not less than 12 months."

**Q.** If I previously filed a preliminary claim form, must I now reapply?

**A.** Yes. Everyone who filed a preliminary claim for **MUST** file an Application for Payment form. You can obtain an Application for Payment kit by detaching and returning the lower portion of the enclosed certificate.

**Q.** What if I did not previously file a preliminary claim form?

**A.** You may request an Application for Payment kit by calling the toll-free phone number listed on this sheet -- even if you did not file a preliminary claim form.

**Q.** What kind of evidence must I submit to show that the veteran was exposed to Agent Orange?

**A.** To meet the Court's test of exposure, you will have to supply information about the veteran's activity, locations and movements within Vietnam. This exposure test will not prove that the veteran was or was not exposed to Agent Orange. The test will only indicate that the veteran may have been in a situation that might have resulted in exposure. You may submit other evidence of exposure if you wish. You will **NOT** be required to prove that the veteran's death or disability was caused by Agent Orange. Please do not send any information regarding exposure until you have received an Application for Payment kit.

**Q.** How much money is available for veterans or their survivors under this program?

**A.** The Court has allocated $160 million (plus interest and earnings) to make payments to totally disabled veterans or families of deceased veterans who were exposed to Agent Orange. Since the size of the total fund is fixed, the amount of each person's payment depends on the total number of veterans or family members who qualify for benefits.

Another $50 million has been set aside to provide funds for selected social services programs for Vietnam veterans and their families.

**Q.** How will payments be made under this program?

**A.** Veterans who are eligible to receive disability payments will receive a payment for each year they are disabled during the life of the Program. The size of each payment will depend on the number of eligible applicants, the veteran's age, and the length of time he or she has been disabled.

Survivors of deceased veterans will receive one lump sum payment. The amount of the payment will depend on the number of eligible applicants, the year of death and the veteran's age at the time of death.

**Q.** If I become totally disabled at some time in the future, may I apply for benefits?

**A.** Yes. Veterans who are not totally disabled now but who become totally disabled during the life of the Program must apply for payments within 120 days of the onset of total disability. Survivors of a veteran who dies while this program is still in effect must apply for payment within 120 days of the veteran's death.

**Q.** When will the program end?

**A.** The Agent Orange Veteran Payment Program will end on December 31, 1994. Applications for Payment will not be accepted after that date.

**Q.** Is there a toll-free number I can call for more information?

**A.** YES. For questions about disability or survivor benefits, call [1-800-225-4712].

# THE AGENT ORANGE VETERAN PAYMENT PROGRAM

## Certificate of Enrollment

According to records on file with the United States
District Court, Eastern District of New York, the person
named at the bottom of this certificate has filed a
timely preliminary claim to participate in the
Agent Orange Product Liability Settlement Fund.

By virtue of that preliminary claim, the individual
named on this certificate is now eligible to apply for
Disability or Survivor Payments under the
Agent Orange Veteran Payment Program.

To qualify for payment, the named individual or the
survivors of that individual must submit all documents
requested by the program and meet all the criteria
for eligibility.

The bottom portion of this certificate may be detached
and mailed any time before the payment program
ends on December 31, 1994.

(Please detach here.)

# THE AGENT ORANGE VETERAN PAYMENT PROGRAM

## Application Request

**Please send me an Application for Payment
kit** so that I may apply for payment from THE
AGENT ORANGE VETERAN PAYMENT
PROGRAM.

I have read the accompanying letter and fact
sheet, and I understand that the only people
eligible for payment under the program are
totally disabled Vietnam veterans, and spouses
or dependent children of deceased Vietnam
veterans.

Claimant's name,
Address
City, State, Zip

If name and address contain errors, please correct them.

_____/__/__/
Your Signature                  Mo  Day Yr.

# AGENT ORANGE VETERAN PAYMENT PROGRAM

## How To Apply For Payments

An
Applicant's
Guide

# Table of contents

**Page**

1    Introduction

2    **Disability payments**
     a. Who is eligible?
     b. Completing the necessary forms.
     c. Be sure to include other necessary documents
     d. Mailing instructions & checklist
     e. What to do if you can't get the documents you need.

5    **Survivor payments**
     a. Who is eligible?
     b. Who is a "spouse"?
     c. Who is a "dependent child"?
     d. Completing the necessary forms.
     e. Be sure to include other necessary documents
     f. Mailing instructions & checklist
     g. What to do if you can't get the documents you need.

9    **Your Military Records**
     a. Submitting your Report of Separation (DD Form 214)
     b. What to do if you can't find your Report
     c. If you need further information

10   **How to apply for Social Security Disability Income**

11   **Map of Vietnam**

12   **What your Application for Payments Kit
     should include**

## Introduction

In requesting an Application for Payment Kit, you have taken a very important first step toward filing your claim for the Disability or Survivor Payments you may be entitled to under the AGENT ORANGE VETERAN PAYMENT PROGRAM.

As you know, this payment program is the plan set up to distribute the more than $230 million in the settlement fund resulting from the Agent Orange Product Liability case settled in 1984. Under this plan, the money will go to eligible Vietnam veterans who are totally disabled, or to the spouses or dependent children of Vietnam veterans who have died.

To help you determine whether you are entitled to payments, this Applicant's Guide outlines the major eligibility criteria for both Disability and Survivor Payments.

The guide also takes you step by step through the process of completing your application, collecting supporting documents, and mailing them.

You'll see which forms you must complete, what supporting documents you must gather, how to get copies of your military records, and where to send all your completed paperwork. You'll also find a special, toll-FREE number to call if you have questions or difficulties while completing the application and other required forms.

We hope you'll find this Guide helpful, and that you'll submit the necessary forms and documents back to us within 60 days of receiving this kit. The sooner we receive your application, the sooner you will know whether you qualify for payments under THE AGENT ORANGE VETERAN PAYMENT PROGRAM.
If you do not qualify for payments, you may appeal the decision.

Thank you for your cooperation.

## Disability Payments

### Who is eligible for disability payments?

You are eligible for disability payments under the AGENT ORANGE VETERAN PAYMENT PROGRAM if you meet these 5 conditions:

1. You served in the U.S. Armed Forces in or near Vietnam at any time from January 1, 1961 to December 31, 1971.

2. You were exposed to Agent Orange while serving in or near Vietnam.

3. You now meet the following definition of "total disability":

    "the inability to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death OR which has lasted or can be expected to last for a continuous period of not less than 12 months.

4. The main cause of your disability was not a traumatic, accidental, or self-inflicted injury.

5. Your disability occurred before your 60th birthday.

    **Note:** you do NOT have to be receiving Social Security Disability payments to be eligible for payments under this program.

### How to apply for payments

### Step 1: Complete the enclosed forms.

If you meet all the conditions listed above, you should apply for Disability Payments from the AGENT ORANGE VETERAN PAYMENT PROGRAM. To apply, you will have to complete the following forms:

- **Application for Disability Payments.** If you are already receiving Social Security Disability Payments Or Supplemental Security Income, skip the questions in the shaded box on page 2. If not, you must complete the entire application form.

- **Exposure Information Form.** You must complete the entire form. Section 1 requires information about your military service and experience. Section II focuses on the locations to which you were assigned while in Vietnam.

    For your convenience, your Application Kit includes a map of Vietnam, with approximate division lines showing where each of the 4 Corps operated. Using the map as a guide, fill in the appropriate dates next to the names of the towns or areas in which you served.

- **Attending Physician's Statement.** On this form, you should only complete Part A, which asks your name, address, Social Security Number, birth date, and whether you are currently receiving Social Security Disability payments.

The rest of the form is for your doctor to complete. Ask him or her to complete the form and return it to the program administrator in the envelope provided in your Application Kit.

**If you need help filling out the forms, call 1 (800) XXX-YYYY.** Someone who knows the details of the AGENT ORANGE VETERAN PAYMENT PROGRAM will provide fast, accurate answers to your questions.

### Step 2: include copies of other necessary documents

In addition to the forms mentioned above, you will have to provide a photocopy of your **"Record of Separation"** (DD Form 214), which you received upon separation from the Armed XX.)

If you have applied for Social Security Disability Income of other disability benefits, you will have to submit copies of the following Social Security, insurance, and government documents as requested in Section B of your Application Form.

- **your Certificate of Social Insurance** (if you answer "yes" to question 2a.
- **your letter of denial** (if you answer "yes " to question 2b.)
- **any letters or documents awarding you** the various types of disability income listed in question 7.

### Mailing Instructions and Checklist

No decision can be made regarding your Application for Disability Payments until you submit all the necessary forms and documents.

The administrator requires that you **submit all paperwork within 60 days** of receiving your Application for Payment Kit. If you are late returning your paperwork and you qualify for payments, your first payment will be delayed by one year. The total amount of all your payments will not be affected.

Here is a checklist of the items which you should include in the 9"X12" pre-addressed envelope provided in this kit:

/__/ the **Application for Disability Payments**

/__/ copies of **any Social Security, insurance, or government forms** requested in Part B of the Application.

/__/ the **Exposure Information Form**

/__/ a copy of the **Report of Separation** (DD Form 214).

In your Application for Payments Kit, you will also find a standard-sized Business Reply Envelope.  Send that to your doctor, along with:

/__/ the **Attending Physician's Statement.**
(Be sure to complete Part A of the Statement before sending it to your doctor.  When your doctor has completed Part B of the statement, he or she should submit it, using the envelope provided in this kit.)

Finally, if you have been unable to find your Report of Separation, send for a duplicate, using the enclosed:

/__/ REQUEST PERTAINING TO MILITARY RECORDS
(See page X for more details.)

**What to do if you can't get the documents you need.**

If you can't gather all the documents you need within 60 days, here's what you should do:

1.  Complete and mail your Application for Disability Payment, as well as  any other program forms which you can complete, such as the Attending Physician's Statement or the Exposure Information form.

2.  Include with your application a brief, written explanation of which documents are missing, and when you expect to submit them.

## Survivor Payments

**Who is eligible for survivor payments?**

You are eligible for survivor payments under the AGENT ORANGE VETERAN PAYMENT PROGRAM if you are the surviving spouse or dependent child of a deceased veteran, and if that veteran:

- served in or the U.S. Armed forces in or near Vietnam at any time between January 1, 1961 to December 31, 1971.

- was exposed to Agent Orange while serving in or near Vietnam.

- did not die primarily from a traumatic, accidental, or self-inflicted injury.

- died before his or her 60th birthday.

**Who is a "spouse".**

The only spouse eligible for a survivor payment under this program is:

"the spouse who was married to the veteran at the time of the veteran's death."

Former spouses who were legally separated or divorced from the veteran at the time the veteran died are NOT eligible.

**Who is a "dependent child"?**

Under the AGENT ORANGE VETERAN PAYMENT PROGRAM, the following types of children are all considered "dependent":

- a son or daughter
- a stepson or stepdaughter
- a child placed for adoption in the veteran's home by an authorized placement agency
- a foster child
- any child who lived in the veteran's home as a family member and depended primarily on the veteran for support.

For a dependent child to qualify for survivor payments under this program:

1. there must be no surviving spouse

2. the dependent child must also have been either a **full-time student** OR **under 19 years old** as of the date the veteran died (or January 1, 1985 - whichever is later).

Any payments made will be divided equally among all the veteran's eligible dependent children.

**How to apply for survivor payments**

**Step 1: Complete the enclosed forms.**

If you are a spouse or a dependent child and you meet the conditions listed above, you should apply for Survivor Payments from the AGENT ORANGE VETERAN PAYMENT PROGRAM. To apply, you will have to complete the following forms:

- **Application for Survivor Payments.**
  1. **Surviving spouse.** If you are a surviving spouse, complete all sections of the application EXCEPT SECTION C.
  2. **Dependent child.** If there is no surviving spouse, the veteran's dependent children or person applying on their behalf should complete all sections of the application except SECTION B.

- **Exposure Information Form.** Section 1 asks for information about the veteran's military service and experience. Section II focuses on the locations at which the veteran served while in Vietnam.

*If you do not know the veteran's unit, service dates or locations in Vietnam, you can find out by completing the REQUEST PERTAINING TO MILITARY RECORDS (Form 180) included in your Application for Payment kit. Be sure to explain what information you need in Box 1 of Section II. (See page XX for more details on obtaining military records.)*

When the veteran's military records arrive, use them to complete as much of the Exposure Information form as you can. The records will not specifically show the locations where the veteran served, so you probably won't be able to complete much of Section II. When you've filled in all you can, send the form and copies of the military records along with your application.

> **If you need help filling out the forms, call 1 (800) XXX-YYYY.** Someone who knows the details of the AGENT ORANGE VETERAN PAYMENT PROGRAM will provide fast, accurate answers to your questions.

**Step 2: include copies of other necessary documents**

In addition to the Application and Exposure Information forms mentioned above, you will have to provide photocopies of:

- the deceased veteran's **"Record of Separation"** (DD Form 214), which he or she received upon separation from the Armed Forces.

- the veteran's **Certificate of Death.** (If the certificate does not state the primary cause of death, you will have to provide additional documents such as an autopsy report or hospital report which does state the primary cause of death.)

If you are surviving spouse, and the deceased veteran's death certificate does not identify you as the surviving spouse, you will have to submit:

- a copy of **your marriage license** (or other documents showing you were married to the veteran.)

If you are applying for payments on behalf of the veteran's dependent child(ren), you will have to provide copies of the following additional documents:

- **birth certificates** for sons and daughters
- **adoption orders or child support orders** for stepsons and stepdaughters, and any adopted children.
- **the veteran's last IRS form 1040** (or equivalent tax forms) for foster children or un-adopted stepchildren depending on the veteran for support.
- **proof of full-time college attendance** (from the institution's registrar) for dependents over age 19 attending college full-time.

## Mailing Instructions and Checklist

No decision can be made regarding your Application for Survivor Payments until you submit all the necessary forms and documents.

The administrator requires that you **submit all paperwork within 60 days** of receiving your Application for Payment Kit. If you are late returning your paperwork and you qualify for payments, your first payment will be delayed by one year. The total amount of all your payments will not be affected.

Here is a checklist of the items you should include in the 9"X12" pre-addressed envelope provided in this kit:

/__/   the **Application for Survivor Payments**

/__/   the **Exposure Information Form** for the deceased veteran.

/__/   the veteran's **Report of Separation** (DD Form 214). If you have been unable to find your Report of Separation, send for a duplicate, using the enclosed REQUEST PERTAINING TO MILITARY RECORDS (Form 180). *See page X for more details.*

/__/   the veteran's **Certificate of Death**

You may also need to submit photocopies of these documents:

/__/   **autopsy reports, hospital reports** or other documents showing primary cause of death.

/__/   **marriage license** or other evidence proving marriage to the veteran.

/__/ **birth certificates, adoption orders, court support orders, or IRS Form 1040** to prove child dependency on the veteran. (See page XX for more details on what to do if you can't get the IRS Form 1040.)

/__/ **college registrar's statement** proving full-time college attendance (for dependents over 19 years old.)

/__/ **other military records.**

**What to do if you can't get the documents you need.**

If you can't gather all the documents you need within 60 days, here's what you should do:

1. Complete and mail your Application for Disability Payment, as well as any other program forms which you can complete, such as the Attending Physician's Statement or the Exposure Information form.

2. Include with your application a brief, written explanation of which documents are missing, and when you expect to submit them

If you're applying on behalf of a dependent child and can't find the veteran's last Federal Income Tax Return, call your local Internal Revenue Service office (listed in the blue pages of your telephone book.) If they can't help you obtain the form, then please submit some other evidence of dependency, such as school records or a letter from a clergyman or public official.

## Your Military Records

### Submitting the Report of Separation

To prove that the veteran served in Vietnam, you must submit a *copy* of the Report of Separation (DD Form 214) you (or the deceased veteran) received upon separation from the Armed Forces. Do NOT send the original.

Attach the copy of your DD form 214 to your Application and any other papers you will be submitting, and mail them all in the large return envelope to the program administrator - within 60 days of receiving your Application Kit.

### What to do if you can't find your Report.

If you can't find the orignal Report of Separation (DD form 214), you can get a duplicate by simply submitting the REQUEST PERTAINING TO MILITARY RECORDS (Form 180) included in your Application Kit.

In completing the request form, be sure to check Box 3a in Section II.

Send your completed REQUEST to the address appropriate for your branch of the service. You'll find all the addresses of the record custodians on the "Instructions" side of your REQUEST form. Please allow 4-6 weeks for processing.

### If you need further military service information

For further military service information (such as dates of service, unit assigned to in Vietnam, etc.), simply write the information you need in Box 1 of Section II of the REQUEST PERTAINING TO MILITARY RECORDS. Here are the forms you should request, for each branch of the miltary:

| | |
|---|---|
| **Army** | DA Form 20 (Enlisted) |
| | DA Form 66 (Officer) |
| | DA Form 21 (Officer Revised) |
| **Navy** | NAVPERS 601-12 |
| | NAVPERS 601-13 |
| **Marine Corps.** | NAVMC 118(3) - PD |
| | NAVMC 118(9) - PD |
| | Sea & Air Travel Embarcation Slips |
| **Air Force** | AF FM 7 (Enlisted) |
| | AF FM 11 (Officer) |
| **Coast Guard** | CG FM 3307 |

## How to apply for Social Security Disability Income

If you are totally disabled and cannot work, you should consider applying for Social Security Disability Benefit. You do NOT have to apply for Social Security Disability Income in order to be eligible for payments under the AGENT ORANGE VETERAN PAYMENT PROGRAM. In the best possible situation, you could receive disability payments from both.

Social Security Disability Payments help you in four ways:

1. **They protect your retirement benefits** you earned while you were working. That income will be based on credits you earned while working. any time spent out of work will reduce the average of credits you earned over the years.

2. **They qualify you automatically for Medicare** after 24 consecutive months of receiving Social Security.

3. **They qualify your dependents for Social Security benefits.**

4. **They can increase your monthly income** with annual cost-of-living increases.

**The first step - contact your local Social Security Office**

As soon as you learn you can no longer work, contact your local Social Security Administration (SSA) office. You'll find their number in the blue pages of your phone book. If you can't go to the office yourself, have a friend, guardian, or family member go for you. Or - just ask the office to mail you the forms they'll need completed in order to forward your application to the State Office that will decide on your case.

When you get the forms, you'll need to provide personal information such as your Social Security number, birth date, the date you became unable to work, a summary of where you've worked in the past 15 years. You'll also have to provide the name and brief description of the physical or mental conditions that keep you from working.

**If your inital claim is rejected, don't get discouraged.**

Almost 70% of all Social Security Disability claims are rejected at first. However, many are later granted after an appeal and hearing process. To learn more about how you can increase your chances of winning an appeal, call this telephone number - (203) 636-7090

## Map of South Vietnam

# What your Application for Payments Kit should include

**1. "How to Apply" 12-page booklet**

**2. Application for Disability Payments**

**3. Application for Survivor Payments**

**4. Exposure Information Form**

**5. Attending Physician's Statement**

**6. Request Pertaining to Military Records (form 180)**

**7. 9 X12" Return envelope**

**8. No. 10 pre-paid physician's return envelope**

AGENT ORANGE VETERAN PAYMENT PROGRAM

# Application for Disability Payments

IMPORTANT NOTE:  To apply for disability payments under this program, you must:
- be long term disabled.
- have served in Vietnam between January 1, 1961 and December 31, 1971.
- meet other program requirements outlined in the enclosed instructions.

## A. About the Veteran

Veteran's Name_____
                 Last              First       Middle

Current Address_____
                  Street

               City              State     ZIP     Country
               Telephone No. (___) _____-_____

Sex /__/M  /__/F     Birth Date  /__/__/__
                             Mo.  Day Yr.

Social Security No.  /__/__/__/ - /__/__/ - /__/__/__/__/

Military Service No.  _____
(if different than Social Security No.)

**Branch of Service**           **Tours of Vietnam Duty**
/__/ Army                 Arrived          Departed
/__/ Navy                 /__/__/__/     /__/__/__/
/__/ Air Force           /__/__/__/     /__/__/__/
/__/ Marines            /__/__/__/     /__/__/__/
/__/ Coast Guard     Mo.  Day Yr.    Mo.  Day Yr.
/__/ Other _____

## B. About the Disability

1. Has a doctor certified that you are totally disabled and unable to work?    /__/yes /__/no
   a. If "yes", when did the doctor certify your disability?  /__/__/__/
   b. What was your last day of work?  /__/__/__/
   c. Briefly list the medical cause(s) of your disability, as mentioned in your doctor's diagnosis. _____
   _____

   d. Was your disability caused by an accident or injury? /__/ no /__/ yes.
   (If yes, briefly describe the accident or injury.)
   _____
   _____
   _____

   e. Explain how the accident or injury contributed to your disability.
   _____
   _____
   _____
   _____

2. a. Have you been declared disabled by the Social Security Administration? /__/ yes /__/ no

   b. Are you presently receiving Social Security Disabliity Income Payments or Supplemental Security Income (SSI)? /__/ yes /__/ no

   **If you answered "yes"** to either 2a or 2b, attach a copy of your Certificate of Social Insurance Award and GO DIRECTLY TO PART C - ASSISTANCE PROGRAMS.

   **If you answered "no"** to either 2a or 2b, the AGENT ORANGE VERERAN PAYMENT PROGRAM will need the following information to help determine your eligibility.

   c. Have you ever applied for Social Security Disability Income?
      /__/ no    See instruction kit, Section 2a., "How to Apply for Social Security Disability Income."
      /__/ yes. When? (__/__/__)
      　　　　　　　　　　Mo.  Day  Yr.

   d. What is the status of your application?
      /__/ pending
      /__/ denied. (If so, attach copy of your Denial Letter.)
      /__/ denied and under appeal. Date of your appeal /__/__/__/
      　　Current status of your appeal

   e. Are you for some reason ineligible for Social Security?
      /__/ no
      /__/ yes. If "yes, briefly state your reason. (e.g., you worked for a public service employer not enrolled in the program.) _____

   f. Have you ever applied for Supplemental Security Income (SSI)?
      /__/ no.  /__/ yes, when?     /__/__/__/

   g. What is the status of your SSI application?
      /__/ pending
      /__/ denied. (If so, attach copy of your Denial Letter.)
      /__/ denied and under appeal.  Date of your appeal /__/__/__/
      Current status of your appeal _____

   h. Are you for some reason ineligible for Supplemental Security Income?
      /__/ no
      /__/ yes. If "yes", briefly state your reason. _____

3. List all physicians, surgeons, and other health care professionals who have treated you during the past 5 years for your disability or a related condition. If you need more space, please attach a separate sheet of paper.

| Name & Address | Condition Treated | From (date) | To (date) | Frequency (daily, weekly, etc.) |
|---|---|---|---|---|
| | | /__/__/__/ - /__/__/__/ | | |
| Name & Address | Condition Treated | From (date) | To (date) | Frequency (daily, weekly, etc.) |
| | | /__/__/__/ - /__/__/__/ | | |
| Name & Address | Condition Treated | From (date) | To (date) | Frequency (daily, weekly, etc.) |
| | | /__/__/__/ - /__/__/__/ | | |
| Name & Address | Condition Treated | From (date) | To (date) | Frequency (daily, weekly, etc.) |
| | | /__/__/__/ - /__/__/__/ | | |

**4.** If you have spent time in any hospitals or other institutions for your disability, please list them here - along with the dates you were in those institutions. If you need more space, please attach a separate sheet of paper.

Name & Address of Institution
_____

Dates Hospitalized
/__/__/__/ - /__/__/__/
Mo. Day Yr. Mo. Day Yr

Street_____City_____State____ZIP_____

Name & Address of Institution
_____

Dates Hospitalized
/__/__/__/ - /__/__/__/
Mo. Day Yr. Mo. Day Yr

Street_____City_____State____ZIP_____

Name & Address of Institution
_____

Dates Hospitalized
/__/__/__/ - /__/__/__/
Mo. Day Yr. Mo. Day Yr

Street_____City_____State____ZIP_____

**5.** What job/occupation were you performing at the time your doctor certified you as totally disabled? Was your disability the reason you stopped working?

a. Who was your employer at that time?

_____
Company Name

_____
Address

b. Was your disability the reason you stopped working?
/__/ yes
/__/ no. (If "no" briefly state why you stopped working. e.g., layoff retirement, termination.)

_____

c. Will you ever be able to return to work?
/__/__/__/  /__/ yes  /__/ no.  /__/ Never
Mo. Day Yr.

d. List other occupations you performed.

_____

**6.** Check the highest level of education you have completed.

| Elementary | High School | College | Graduate or Professional School |
|---|---|---|---|
| /__/__/__/__/__/__/__/__/ | /__/__/__/__/ | /__/__/__/__/ | /__/ |
| 1 2 3 4 5 6 7 8 | 9 10 11 12 | 1 2 3 4 | |

**7.** If you are receiving disability income from (or have been declared disabled by) any sources other than Social Security, please check them below. Also, please indicate the start date and the scheduled end date for those payments. **Note:** receipt of payments from other sources will NOT affect your eligibility to receive payments under this program.

| Source | Start Date Mo. Day Yr. | End Date Mo. Day Yr. |
|---|---|---|
| /__/ Veterans' Administration | /__/__/__/ | /__/__/__/ |
| /__/ Workers' Compensation | /__/__/__/ | /__/__/__/ |
| /__/ Group Disability Insurance | /__/__/__/ | /__/__/__/ |
| /__/ Individual Disability Policy | /__/__/__/ | /__/__/__/ |
| /__/ Retirement or Pension Plan | /__/__/__/ | /__/__/__/ |
| /__/ Sick Leave | /__/__/__/ | /__/__/__/ |
| /__/ Salary Continuation | /__/__/__/ | /__/__/__/ |
| /__/ Other_____ | /__/__/__/ | /__/__/__/ |

1304

## C. Federal, State, and Local Assistance Programs

The court has requested that you list any income or other benefits you are receiving from federal, state, or local assistance programs. This information will NOT be used in evaluating payment applications, but it may identify and assist people whose benefits from these other programs might be affected by receiving money from the AGENT ORANGE VETERAN PAYMENT PROGRAM.

**Name of Program**

/__/ Federal Programs _____

_____

/__/ State Programs _____

_____

/__/ Local Programs _____

_____

## D. Authorization And Certification

**I authorize** all physicians, health professionals, hospitals, health care institutions, and governmental agencies to release to the Claim Administrator of the AGENT ORANGE VETERAN PAYMENT PROGRAM information relating to my Military Records, Social Security benefits, and any advice, treatment and services I have received for health care (including mental health care).

**I certify** that the information (including Social Security number) I have provided on this Application for Payment is correct and complete to the best of my knowledge.

**I understand** that:

- my authorization is valid for the duration of the program
- I have a right to receive a photocopy of this authorization upon request, and that a copy of it is as valid as the original.
- all information provided with this application will be kept strictly confidential, and will be used ONLY to evaluate and administer this application.
- the penalty for providing false information is prosecution for perjury.
- the Court will supervise the payment of all attorneys' fees in connection with this Program.

_____     Date /__/__/__/
Signature of Veteran or Authorized Representative          Mo. Day Yr.

If you are signing as an authorized representative, indicate your legal capacity.

## E. Authorized Representative's Statement

(ONLY for authorized representatives of veterans unable to complete this application.)

**I certify** that (_____) lacks the legal capacity to receive payments under this program,
                    Name of Veteran

and that any payment made to me on behalf of that person will be used for his or her care and support.

**I understand** that, in the event that another party makes a successful claim to the payment, I may have to reimburse the AGENT ORANGE VETERAN PAYMENT PROGRAM.

_____     Date /__/__/__/
Signature of Authorized Representative          Mo. Day Yr.

AGENT ORANGE VETERAN PAYMENT PROGRAM

# Application for Survivor Payment

This application should only be completed by surviving spouses or dependent children (or their legal guardians) of deceased veterans who served in Vietnam at any time between January 1, 1961 and December 31, 1971.

**IMPORTANT:** If both the spouse and dependent child(ren) of a deceased veteran are still alive, only the spouse may receive payment. Dependent children will be eligible for payments only if there is no surviving spouse. You may either apply for spouse payments (complete Section B) OR dependent child(ren)'s payments (complete Section C). You may NOT apply for both.

## A. About the Veteran

Veteran's Name _____

                        Last                      First        Middle

Address at the _____
time of death        Street

                    _____

                    City              State     ZIP     Country

Telephone No. (___) _____-_____

Sex /__/M /__/F    Birth Date /__/__/__
                            Mo. Day Yr.

Social Security No.  /__/__/__/ - /__/__/ - /__/__/__/__/

Military Service No. _____
(if different than Social Security No.)

Branch of Service           Tours of Vietnam Duty
/__/ Army               Arrived        Departed
/__/ Navy              /__/__/__/   /__/__/__/
/__/ Air Force         /__/__/__/   /__/__/__/
/__/ Marines          /__/__/__/   /__/__/__/
/__/ Coast Guard    Mo. Day Yr.   Mo. Day Yr.
/__/ Other _____

Date of veteran's death /__/__/__/    Primary cause of death _____
                    Mo. Day Yr.    _____

                                     Contributing cause of death _____
                                     _____

Did the deceased veteran ever apply for Disability Payments under this program?
/__/ no
/__/ yes.  (If "yes," indicate the status of that application.)
        /__/ approved    /__/ denied   /__/ pending

**Supporting Documents Required:**
- Please attach a certified copy of the veteran's Certificate of Death.
- If the Certificate of Death does NOT list the specific cause of death, attach copies of other documents which show the specific cause (e.g., hospital report, autopsy report, doctor's statement.)

6/27/88

## B. About the Spouse

(If you complete this section, do NOT complete Section C.)

Spouse's name _____ Soc. Sec. No./_/_/_/-/_/_/-/_/_/_/_/
Current Address_____ Birth date /_/_/_/
                                            Mo. Day Yr.
_____
      City        ST      ZIP          Sex /_/F  /_/M
Date of marriage to veteran  /_/_/_/   Phone:
Place of marriage _____       Home ( ) ___-_____
              City              ST     Work( ) ___-_____

If you and the veteran were legally separated or divorced at the time of the veteran's death, please complete the following:
  /_/ legally separated as of /_/_/_
  /_/ divorced as of /_/_/_/

**Supporting Documents Required:**
• If the veteran's Certificate of Death does not list marital status or name you as the surviving spouse, you must attach a copy of your marriage license or other documentary evidence of marriage.

## C. About the Dependent Child(ren)

(If you complete this section, do NOT complete Section B above.)

In the spaces below, please write the requested information about any and all dependent children of which you are aware - even those children the veteran may have had by another spouse. If the child is a minor, please list the name of the guardian responsible for him or her.

Child's Name        .    Birth date     Soc. Sec. No.        Phone
_____  /_/_/_/  /_/_/_/-/_/_/-/_/_/_/_/ ( )/_/_/_/-/_/_/_/
_____
Address          City        ST    ZIP     Legal Guardian

Child's Name             Birth date     Soc. Sec. No.        Phone
_____  /_/_/_/  /_/_/_/-/_/_/-/_/_/_/_/ ( )/_/_/_/-/_/_/_/
_____
Address          City        ST    ZIP     Legal Guardian

Child's Name             Birth date     Soc. Sec. No.   ·    Phone
_____  /_/_/_/  /_/_/_/-/_/_/-/_/_/_/_/ ( )/_/_/_/-/_/_/_/
_____
Address          City        ST    ZIP     Legal Guardian

| Child's Name | Birth date | Soc. Sec. No. | Phone |
|---|---|---|---|
| | _/_/_/_/ | _/_/_/-_/_/-_/_/_/_/ | ( )_/_/_/-_/_/_/_/ |

| Address | City | ST | ZIP | Legal Guardian |
|---|---|---|---|---|

| Child's Name | Birth date | Soc. Sec. No. | Phone |
|---|---|---|---|
| | _/_/_/_/ | _/_/_/-_/_/-_/_/_/_/ | ( )_/_/_/-_/_/_/_/ |

| Address | City | ST | ZIP | Legal Guardian |
|---|---|---|---|---|

(If there are additional children, please list them on a separate sheet of paper and attach it to this application.)

**Supporting Documents Required:**
- For each dependent child listed above, attach a copy of a birth certificate, adoption order, or child support order.
- If any of the above-listed children were unadopted stepchildren, foster children, or children living as family members in the veteran's home, please attach a copy of the veteran's last IRS Form 1040 or equivalent tax form, which lists the child as a dependent.

## D. Authorization And Certification

**I authorize** all physicians, health professionals, hospitals, health care institutions, and governmental agencies to release to the Administrator of the AGENT ORANGE VETERAN PAYMENT PROGRAM any and all information relating to the deceased veteran's military service, Social Security benefits, and advice, treatment and services received for health care (including mental health care).

**I certify** that the information (including Social Security numbers) I have provided on this Application for Payment is correct and complete to the best of my knowledge.
**I understand** that:

- my authorization is valid for the duration of the program

- I have a right to receive a photocopy of this authorization upon request, and that a copy of it is as valid as the original.

- all information provided with this application will be kept strictly confidential, and will be used ONLY to evaluate and administer this application.

- the penalty for providing false information is prosecution for perjury.

- the Court will supervise payment of all attorneys' fees in connection with this program.

- an application filed on behalf of a child born on or after May 7, 1984, may constitute a waiver of any claim of the child against the defendant chemical companies that participated in the Agent Orange settlement.

Date /_/_/_/
Mo. Day Yr.

_____     _____
Signature of Survivor             Relationship to
or Authorized Representative    Veteran

If signing as an authorized representative, indicate your legal capacity.

_____

## E. Authorized Representative's Statement

(ONLY for legal guardians or authorized representatives of eligible survivors)

**I certify** that:

- I am the legal guardian/authorized representative (circle one) of the person applying for payments under this program.

- the applicant is a minor or lacks the legal capacity to receive such payments.

- any payment made to me on behalf of that person will be used for his or her care and support and not for any other purpose.

**I understand** that:

- in the event that another party makes a successful claim to the payment, I may have to reimburse the AGENT ORANGE VETERAN PAYMENT PROGRAM.

_____
Signature of Authorized Representative

Date /__/__/__/
Mo. Day Yr.

AGENT ORANGE VETERAN PAYMENT PROGRAM

# Attending Physician's Statement

*To be completed for every veteran applying for a disability payment.*

## Part A. - Patient (Veteran) Information

(to be completed by the veteran)

Patient's
Name _____ Soc. Sec. No. /_/_/_/-/_/_/-/_/_/_/_/
    (Last)        (First)      (M.I.)

Address _____ Birth Date /_/_/_/_/
    Street        City    ST   ZIP        Mo. Day Yr.

Are you presently receiving Social Security Disability Income Payments or Supplemental
Security Income?

    /_/ yes /_/ no

Important: After you have completed Part A, send this form and the pre-addressed envelope from your Application Kit to your physician. Ask him or her to complete Part B of this Attending Physician's Statement as soon as possible and return it to:

    Program Administrator
    THE AGENT ORANGE VETERAN PAYMENT PROGRAM
    P.O. BOX 99
    HARTFORD, CT 06156

## Part B. Physician Information

(To be completed by the veteran's (patient's) physician ONLY)

Notice to Physicians:

Your patient (the veteran named above) has filed an Application for Disability Payments under THE AGENT ORANGE VETERAN PAYMENT PROGRAM. To qualify for payments, your patient must demonstrate "total disability" as defined by the Social Security Act.

In order to evaluate this veteran's application, we need information from you regarding the diagnosis, history, present condition, and treatment of your patient's disability. We cannot begin that evaluation until we receive this Attending Physician's Statement from you.

If your patient has answered "yes" above to indicate that he or she is receiving Social Security Disability Income, you need only complete Section 1 - Diagnosis, and Section 11 - Remarks/Signature.

**If your patient has answered "no"** above, please complete the entire inside of this form, Sections 1-11.

If you have any questions while completing this statement, please call the Program Administrator's Office toll-FREE at 1 (800) XXX-YYYY.

After you have completed this Statement, please place it in the pre-addressed envelope your patient should have provided you, and mail it as soon as possible to the address shown above.

Thank you.

6/27/88          *(See Sections 1 - 11*

Part B. (Continued)
Reminder: If your patient answered "yes" in Part A on the front cover, complete only Sections 1 and 11. If your patient answered "no", complete all Sections.

## 1. DIAGNOSIS

(a) When did you last examine the patient? /__/__/__/

(b) Your diagnosis (including any complications) _____
_____
_____
_____

(c) Subjective symptoms. (Describe the Disease) _____
_____
_____
_____

(d) Is condition due to accidental, self-inflicted or traumatic injury?
/__/ no
/__/ yes. If "yes," describe the nature of the injury. _____
_____
_____

## 2. HISTORY

Weight _____ Height _____
(a) When did symptoms first appear or accident happen? /__/__/__/
(b) When did patient cease work because of disability? /__/__/__/
(c) Has patient ever had same or similar condition?
/__/ no
/__/ yes If "Yes" state when and describe._____
_____

(d) Objective findings (including current X-rays, EKG's, laboratory data and clinical findings)

(e) Names and addresses of other treating physicians
_____
_____
_____
_____

## 3. DATES OF TREATMENT

(a) Date of first visit /__/__/
(b) Date of last visit /__/__/
(c) Frequency /__/ Weekly /__/ Monthly /__/ Other (Specify)_____
(d) Is patient still under your care for this condition?
/__/ Yes
/__/ No If no, indicate date service terminated /__/__/__/

## 4. NATURE OF TREATMENT
(Including surgery and medications prescribed, if any)

## 5. PROGRESS

(a) Has patient  /_/ Recovered?  /_/ Improved?  /_/ Stabilized?
/_/ Retrogressed?

(b) Is patient  /_/ Ambulatory?  /_/ House confined?  /_/ Bed confined?
/_/ Hospital confined?

(c) Has patient been hospital confined?
/_/ No
/_/ Yes   If yes, give Name and Address of Hospital

_____

_____

Confined from /__/__/__/ through /__/__/__/

## 6. CARDIAC
(If Applicable)

(a) Functional Capacity          Class 1 (No limitation) /_/
(American Heart Assoc.)      Class 2 (Slight limitation) /_/
Class 3 (Marked limitation) /_/
Class 4 (Complete limitation) /_/

(b) Blood Pressure (last visit)    _____/_____
Systolic    Diastolic

## 7. LIMITATIONS

(a) What are patient's present capabilities?

(b) What are present limitations (physical and/or mental)?

(c) What restrictions are placed on patient?

## 8. PHYSICAL IMPAIRMENT
(as defined in Federal Dictionary of Occupational Titles)

/_/ Class 1 - No limitation of functional capacity; capable of heavy work.  No
restrictions. (1-10%)
/_/ Class 2 - Medium manual activity. (15-30%)
/_/ Class 3 - Slight limitations of functional capacity;
capable of light work. (35-55%)
/_/ Class 4 - Moderate limitation of functional capacity; capable of clerical/
administrative (sedentary) activity. (60-70%)
/_/ Class 5 - Severe limitation of functional capacity; incapable of minimal
(sedentary) activity. (75-100%)
/_/ Remarks:

### 9. MENTAL / NERVOUS IMPAIRMENT
(if applicable)

(a) Please define "stress" as it applies to this claimant.

(b) What stress and problems in interpersonal relations has claimant had on job?

/_/ Class 1 - Patient is able to function under stress and engage in interpersonal relations (no limitation)

/_/ Class 2 - Patient is able to function in most stress situations and engage in most relations (slight limitations)

/_/ Class 3 - Patient is able to engage in only limited stress situations and engage in only limited interpersonal relations (moderate limitations)

/_/ Class 4 - Patient is unable to engage in stress situations or engage in interpersonal relations (marked limitations)

/_/ Class 5 - Patient has significant loss of psychological, physiological, personal and social adjustment (severe limitations)

/_/ Remarks:

Do you believe the patient is competent to endorse checks and direct the use of the proceeds thereof? /_/ Yes /_/ No

### 10. PROGNOSIS

(a) What is the patient's prognosis?

(b) How long from now do you feel patient's maximum medical improvement will be reached?
/_/ 3 months /_/ 6 months /_/ 1 year /_/ longer

### 11. REMARKS/SIGNATURE

Name (Attending Physician) Print     Degree     Specialty     Telephone

Street Address     City or Town     State or Province     Zip Code

Signature     Date

**AGENT ORANGE VETERAN PAYMENT PROGRAM**

# Exposure Information Form

**IMPORTANT NOTE:** In order to be eligible for payment under this program, a veteran must have come into contact with herbicides during his or her period of service in Vietnam. This form is designed to assist you in providing information by which your exposure experiences or those of a deceased veteran can be determined as described in the enclosed instructions.

Veteran's Name _____
               Last                      First              (M.I.)

Veteran's Social Security No. _____ Veteran's Date of Birth _____

Military Service No. _____
                  (If different than Social Security No.)

---

### I. Military Service and Experience

1. Give the veteran's complete **unit assignment** and the **dates** served. If the veteran was assigned to more than one unit, identify each unit. Also, indicate his or her military occupational specialty (MOS/AFSC/NEC) for each unit.

    The following are examples of a complete unit identification:
    1. Troop B, 1st Squadron, 17th Cavalry, 82nd Airborne Division
    2. Company F, 2nd Battalion, 3rd Marines
    3. Company A, 2/35th Infantry, 3rd Brigade, 25th Inf. Division

|  | Dates |  |
|---|---|---|
|  | from | to |

Branch of Service _____

Unit _____
    | | | |    | | | |
    mo. yr.    mo. yr.

MOS/AFSC/NEC _____

Unit _____
    | | | |    | | | |
    mo. yr.    mo. yr.

MOS/AFSC/NEC _____

Unit _____
    | | | |    | | | |
    mo. yr.    mo. yr.

MOS/AFSC/NEC _____

Unit _____
    | | | |    | | | |
    mo. yr.    mo. yr.

2. Identify any major **military operations** in Vietnam in which the veteran participated - (for example: The Battle of Hue or Operation Cedar Falls).

| | Dates | |
|---|---|---|
| | from | to |
| _____ | \| \| \| \|<br>mo. yr. | \| \| \| \|<br>mo. yr. |
| _____ | \| \| \| \|<br>mo. yr. | \| \| \| \|<br>mo. yr. |
| _____ | \| \| \| \|<br>mo. yr | \| \| \| \|<br>mo yr. |

3. Identify any **Fire Bases** (FSB) or **Landing Zones** (LZ) in which the veteran was located during his or her tours of duty in Vietnam.

_____

_____

_____

_____

4. If the veteran had any special military jobs, assignments, or experiences in Vietnam which you believe exposed him or her directly to herbicides, please describe them.

_____

_____

_____

_____

5. If there is any other reason to believe the veteran was directly exposed to herbicides while in Vietnam, please list them below.

_____

_____

_____

_____

## II. Locations of Service in Vietnam

In this part of the application form, you are asked to reconstruct, as closely as possible, the locations in which you or the deceased veteran served while in Vietnam. Check off whether you were stationed in any of the areas named in the following list. The names are alphabetical and are divided into the four Corps' areas of Vietnam. If you were on assignment, such as jungle patrol, indicate the base camp, area or command post closest to where you were.

If none of the place names describe your locations while on Vietnam duty, you may enter additional names in the spaces marked "other" in the appropriate Corps area.

| I CORPS | | II CORPS | |
|---|---|---|---|
| An Loi | _____ | An Khe | _____ |
| Ashau Valley | _____ | Ban Me Thuot | _____ |
| Cam Lo | _____ | Bao Loc | _____ |
| Camp Carroll | _____ | Ben Het | _____ |
| Camp Eagle | _____ | Bon Son | _____ |
| Camp Evans | _____ | Can Ranh Bay | _____ |
| Chu Lai | _____ | Camp Enari | _____ |
| Con Thien | _____ | Dak Pek | _____ |
| Da Nang | _____ | Dak To | _____ |
| Dong Ha | _____ | Dong Ba Thin | _____ |
| Dong Le | _____ | Duc Co | _____ |
| Duc Pho | _____ | Duc Lap | _____ |
| Gio Linh | _____ | Duc Pho | _____ |
| Hiep Duc | _____ | Hammond | _____ |
| Hoi An | _____ | Kontum | _____ |
| Hue | _____ | Landing Zone | _____ |
| Kham Duc | _____ | English | _____ |
| Khe Sanh | _____ | Nha Trang | _____ |
| Kong Phu | _____ | Oasis | _____ |
| Ma Ca | _____ | Phan Rang | _____ |
| Mai Loc | _____ | Phan Thiet | _____ |
| Marble Mountain | _____ | Phu Hiep | _____ |
| My Son | _____ | Phu Nhieu | _____ |
| Nuong Xuan | _____ | Plei Djerling | _____ |
| Phong Dien | _____ | Plei Herel | _____ |
| Phu Bai | _____ | Pleiku | _____ |
| Phu Loc | _____ | Polei Kleng | _____ |
| Quang Ngai | _____ | Qui Nhon | _____ |
| | | Suoi Da | _____ |
| | | Tuy Hoa | _____ |
| Other | _____ | Other | _____ |
| Other | _____ | Other | _____ |
| Other | _____ | Other | _____ |

**1316**

## III CORPS

| | |
|---|---|
| Bao Trai | _____ |
| Bear Cat | _____ |
| Ben Cat | _____ |
| Bien Hoa | _____ |
| Binh Phuoc | _____ |
| Binh Thoi | _____ |
| Black Virgin Mt | _____ |
| Bu Dop | _____ |
| Cat Lai | _____ |
| Chon Thanh | _____ |
| Courtenay | _____ |
| Cu Chi | _____ |
| Dau Tieng | _____ |
| Di An | _____ |
| Duc Pho | _____ |
| Due Hoa | _____ |
| Fish Hook | _____ |
| Gao Ho Nai | _____ |
| Gia Ray | _____ |
| Ham Tan | _____ |
| Hoc Mon | _____ |
| Katum | _____ |
| Lai Khe | _____ |
| Loc Nihn | _____ |
| Long Bihn | _____ |
| Long Giao | _____ |
| Long Thanh | _____ |
| Parrot's Beak | _____ |
| Phu Cuong | _____ |
| Phu Loi | _____ |
| Phy My | _____ |
| Phuoc Hiep | _____ |
| Phuoc Vinh | _____ |
| Quan Lei | _____ |
| Saigon | _____ |
| Song Be | _____ |
| Tay Ninh | _____ |
| Thai Tien | _____ |
| The Loi | _____ |
| Thien Ngon | _____ |
| Ton Son Nhut | _____ |
| Tri Tam | _____ |
| Vung Tau | _____ |

## III CORPS
## (continued)

| | |
|---|---|
| Xa Cam | _____ |
| Xuan Loc | _____ |
| | |
| Other | _____ |
| Other | _____ |
| Other | _____ |
| Other | _____ |
| Other | _____ |
| Other | _____ |

## IV CORPS

| | |
|---|---|
| An Loc | _____ |
| Ben Luc | _____ |
| Binh Chanh | _____ |
| Can Giuoc | _____ |
| Can Tho | _____ |
| Doug Tam | _____ |
| My To | _____ |
| Nha Be | _____ |
| Rach Kien | _____ |
| Tan An | _____ |
| Tan Truan | _____ |
| Vinh Long | _____ |
| | |
| Other | _____ |
| Other | _____ |
| Other | _____ |
| Other | _____ |
| Other | _____ |

_____

Signature of person completing
this form

Date |__|__|__|
     Mo. Day Yr.

## REQUEST PERTAINING TO MILITARY RECORDS

*Please read instructions on the reverse. If more space is needed, use plain paper.*

PRIVACY ACT OF 1974 COMPLIANCE INFORMATION. The following information is provided in accordance with 5 U.S.C. 552a(e)(3) and applies to this form. Authority for collection of the information is 44 U.S.C. 2907, 3101, and 3103, and E.O. 9397 of November 22, 1943. Disclosure of the information is voluntary. The principal purpose of the information is to assist the facility servicing the records in locating and verifying the correctness of the requested records or information to answer your inquiry. Routine uses of the information as established and published in accordance with 5 U.S.C.a(e)(4)(D)

include the transfer of relevant information to appropriate Federal, State, local, or foreign agencies for use in civil, criminal, or regulatory investigations or prosecution. In addition, this form will be filed with the appropriate military records and may be transferred along with the record to another agency in accordance with the routine uses established by the agency which maintains the record. If the requested information is not provided, it may not be possible to service your inquiry.

### SECTION I—INFORMATION NEEDED TO LOCATE RECORDS (Furnish as much as possible)

| 1. NAME USED DURING SERVICE *(Last, first, and middle)* | 2. SOCIAL SECURITY NO. | 3. DATE OF BIRTH | 4 PLACE OF BIRTH |
|---|---|---|---|
| | | | |

5. ACTIVE SERVICE, PAST AND PRESENT    (For an effective records search, it is important that ALL service be shown below)

| BRANCH OF SERVICE (Also, show last organization, if known) | DATES OF ACTIVE SERVICE | | Check one | | SERVICE NUMBER DURING THIS PERIOD |
|---|---|---|---|---|---|
| | DATE ENTERED | DATE RELEASED | OFFI-CER | EN-LISTED | |
| | | | | | |
| | | | | | |
| | | | | | |

6. RESERVE SERVICE, PAST OR PRESENT    If "none," check here ▶ ☐

| a. BRANCH OF SERVICE | b DATES OF MEMBERSHIP | | c. Check one | | d. SERVICE NUMBER DURING THIS PERIOD |
|---|---|---|---|---|---|
| | FROM | TO | OFFI-CER ☐ | EN-LISTED ☐ | |

7. NATIONAL GUARD MEMBERSHIP    (Check one).    ☐ a. ARMY    ☐ b. AIR FORCE    ☐ c. NONE

| d. STATE | e ORGANIZATION | f. DATES OF MEMBERSHIP | | g. Check one | | h. SERVICE NUMBER DURING THIS PERIOD |
|---|---|---|---|---|---|---|
| | | FROM | TO | OFFI-CER ☐ | EN-LISTED ☐ | |

8. IS SERVICE PERSON DECEASED    ☐ YES   ☐ NO    If "yes," enter date of death.

9. IS (WAS) INDIVIDUAL A MILITARY RETIREE OR FLEET RESERVIST    ☐ YES   ☐ NO

### SECTION II—REQUEST

1 EXPLAIN WHAT INFORMATION OR DOCUMENTS YOU NEED: OR, CHECK ITEM 2: OR, COMPLETE ITEM 3 _____

2. IF YOU ONLY NEED A STATEMENT OF SERVICE    check here ☐

3. LOST SEPARATION DOCUMENT REPLACEMENT REQUEST (Complete a or b, and c.)

| | | | |
|---|---|---|---|
| ☐ | a REPORT OF SEPARATION (DD Form 214 or equivalent) | YEAR ISSUED | This contains information normally needed to determine eligibility for benefits. It may be furnished only to the veteran, the surviving next of kin, or to a representative with veteran's signed release (Item 5 of this form). |
| ☐ | b. DISCHARGE CERTIFICATE | YEAR ISSUED | This shows only the date and character at discharge. It is of little value in determining eligibility for benefits. It may be issued only to veterans discharged honorably or under honorable conditions; or, if deceased, to the surviving spouse |

c. EXPLAIN HOW SEPARATION DOCUMENT WAS LOST

4. EXPLAIN PURPOSE FOR WHICH INFORMATION OR DOCUMENTS ARE NEEDED

6. REQUESTER

a. IDENTIFICATION (check appropriate box)

☐ Same person identified in Section I    ☐ Surviving spouse

☐ Next of kin (relationship) _____

☐ Other (specify)

b. SIGNATURE (see instruction 3 on reverse side)    DATE OF REQUEST

5. RELEASE AUTHORIZATION, IF REQUIRED (Read instruction 3 on reverse side)

I hereby authorize release of the requested information/documents to the person indicated at right (Item 7)

VETERAN SIGN HERE ▶ _____

(If signed by other than veteran show relationship to veteran.)

7. Please type or print clearly --    COMPLETE RETURN ADDRESS

Name, number and street, city, State and ZIP code _____

TELEPHONE NO. (include area code) ▶

# 1318

## INSTRUCTIONS

1. **Information needed to locate records.** Certain identifying information is necessary to determine the location of an individual's record of military service. Please give careful consideration to and answer each item on this form. If you do not have and cannot obtain the information for an item, show "NA," meaning the information is "not available." Include as much of the requested information as you can. This will help us to give you the best possible service.

2. **Charges for service.** A nominal fee is charged for certain types of service. In most instances service fees cannot be determined in advance. If your request involves a service fee you will be notified as soon as that determination is made.

3. **Restrictions on release of information.** Information from records of military personnel is released subject to restrictions imposed by the military departments consistent with the provisions of the Freedom of Information Act of 1967 (as amended in 1974) and the Privacy Act of 1974. A service person has access to almost any information contained in his own record. The next of kin, if the veteran is deceased, and Federal officers for official purposes, are authorized to receive information from a military service or medical record only as specified in the above cited Acts. Other requesters must have the release authorization in item 5 of the form, signed by the veteran or, if deceased, by the next of kin. Employers

and others needing proof of military service are expected to accept the information shown on documents issued by the Armed Forces at the time a service person is separated.

4. **Location of military personnel records.** The various categories of military personnel records are described in the chart below. For each category there is a code number which indicates the address at the bottom of the page to which this request should be sent. For each military service there is a note explaining approximately how long the records are held by the military service before they are transferred to the National Personnel Records Center, St. Louis. Please read these notes carefully and make sure you send your inquiry to the right address. Please note especially that the record is not sent to the National Personnel Records Center as long as the person retains any sort of reserve obligation, whether drilling or non-drilling.

*(If the person has two or more periods of service within the same branch, send your request to the office having the record for the last period of service.)*

5. **Definitions for abbreviations used below:**
NPRC—National Personnel Records Center     PERS—Personnel Records
TDRL—Temporary Disability Retirement List     MED—Medical Records

| SERVICE | NOTE: (See paragraph 4 above.) | CATEGORY OF RECORDS — WHERE TO WRITE ADDRESS CODE | ▼ |
|---|---|---|---|
| **AIR FORCE (USAF)** | Except for TDRL and general officers retired with pay, Air Force records are transferred to NPRC from Code 1, 90 days after separation and from Code 2, 150 days after separation | Active members (includes National Guard on active duty in the Air Force), TDRL, and general officers retired with pay. | 1 |
| | | Reserve, retired reservist in nonpay status, current National Guard officers not on active duty in Air Force, and National Guard released from active duty in Air Force | 2 |
| | | Current National Guard enlisted not on active duty in Air Force. | 13 |
| | | Discharged, deceased and retired with pay. | 14 |
| **COAST GUARD (USCG)** | Coast Guard officer and enlisted records are transferred to NPRC 7 months after separation. | Active, reserve, and TDRL members | 3 |
| | | Discharged, deceased, and retired members (see next item). | 14 |
| | | Officers separated before 1/1/29 and enlisted personnel separated before 1/1/15 | 6 |
| **MARINE CORPS (USMC)** | Marine Corps records are transferred to NPRC between 6 and 9 months after separation | Active, TDRL, and Selected Marine Corps Reserve members | 4 |
| | | Individual Ready Reserve and Fleet Marine Corps Reserve members | 5 |
| | | Discharged deceased, and retired members (see next item) | 14 |
| | | Members separated before 1/1/1905 | 6 |
| **ARMY (USA)** | Army records are transferred to NPRC as follows: Active Army and Individual Ready Reserve Control Groups About 60 days after separation. U.S. Army Reserve Troop Unit personnel: About 120 to 180 days after separation | Reserve, living retired members, retired general officers, and active duty records of current National Guard members who performed service in the U.S. Army before 7/1/72* | 7 |
| | | Active officers (including National Guard on active duty in the U.S. Army). | 8 |
| | | Active enlisted (including National Guard on active duty in the U.S. Army) and enlisted TDRL | 9 |
| | | Current National Guard officers not on active duty in the U.S. Army. | 12 |
| | | Current National Guard enlisted not on active duty in the U.S. Army | 13 |
| | | Discharged and deceased members (see next item) | 14 |
| | | Officers separated before 7/1/17 and enlisted separated before 11/1/12 | 6 |
| | | Officers and warrant officers TDRL | 8 |
| **NAVY (USN)** | Navy records are transferred to NPRC 6 months after retirement or complete separation. | Active members (including reservists on duty)—PERS and MED | 10 |
| | | Discharged, deceased, retired (with and without pay) less than six months, | PERS ONLY | 10 |
| | | TDRL, drilling and nondrilling reservists | MED ONLY | 11 |
| | | Discharged, deceased, retired (with and without pay) more than six months (see next item)—PERS & MED | 14 |
| | | Officers separated before 1/1/03 and enlisted separated before 1/1/1886—PERS and MED | 6 |

*Code 12 applies to active duty records of current National Guard officers who performed service in the U.S. Army after 6/30/72.*
*Code 13 applies to active duty records of current National Guard enlisted members who performed service in the U.S. Army after 6/30/72.*

### ADDRESS LIST OF CUSTODIANS (BY CODE NUMBERS SHOWN ABOVE)—Where to write / send this form for each category of records

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **1** | Air Force Manpower and Personnel Center Military Personnel Records Division Randolph AFB, TX 78150-6001 | **5** | Marine Corps Reserve Support Center 10950 El Monte Overland Park, KS 66211-1408 | **8** | USA MILPERCEN ATTN: DAPC-MSR 200 Stovall Street Alexandria, VA 22332-0400 | **12** | Army National Guard Personnel Center Columbia Pike Office Building 5600 Columbia Pike Falls Church, VA 22041 |
| **2** | Air Reserve Personnel Center Denver, CO 80280-5000 | **6** | Military Archives Division National Archives and Records Administration Washington, DC 20408 | **9** | Commander U.S. Army Enlisted Records and Evaluation Center Ft. Benjamin Harrison, IN 46249-5301 | **13** | The Adjutant General (of the appropriate State, DC, or Puerto Rico) |
| **3** | Commandant U.S Coast Guard Washington, DC 20593-0001 | **7** | Commander U.S Army Reserve Personnel Center ATTN: DARP-PAS 9700 Page Boulevard St Louis, MO 63132-5200 | **10** | Commander Naval Military Personnel Command ATTN: NMPC-036 Washington, DC 20370-5036 | **14** | National Personnel Records Center (Military Personnel Records) 9700 Page Boulevard St. Louis, MO 63132 |
| **4** | Commandant of the Marine Corps (Code MMRB-10) Headquarters, U.S. Marine Corps Washington, DC 20380-0001 | | | **11** | Naval Reserve Personnel Center New Orleans, LA 70146-5000 | | |

☆ U.S. Government Printing Office 1987—181-247/40207

STANDARD FORM 180 BACK (Rev 7-85)